The Chancellor.
The question as to the validity of such an assignment as this, is no longer an open question in this court. In the case of Wakeman v. Grover, (4 Paige’s Rep. 41,) this court decided that a debtor could not put his property beyond the reach of his creditors at law by assigning it to trustees to pay debts, without settling the rights of creditors under the assignment; leaving it to the assignees to give such future preferences in payment as they might deem proper. It is true that ground of objection to the assigument of Grover & Gunn was not distinctly passed upon by the majority of the members of the court for the correction of errors, when that case was brought there by appeal; as that court wished to settle definitively another principle of great importance to the rights of creditors, which had for the first time been distinctly decided *228 in this state by the court whose decision was then under review. But in the opinion of Mr. Justice Sutherland, which I have no doubt had been seen and approved by his associates on the bench of the supreme court, Chief Justice Savage and Justice Nelson, he distinctly sustains the decision of this court upon the question now under consideration. He says, “ It has repeatedly been decided that an assignment which does not declare the uses, but reserves to the assignor the power of subsequently doing it, is fraudulent and void. And if" the assignor cannot reserve the power to himself of giving preferences, he certainly cannot legally confer it upon his assignee; the same objection in principle exists in both cases.” In the subsequent case of Barnum v. Hempstead, (7 Paige’s Rep. 568,) which was very much like the present, in this respect, this court again decided that an assignment of a debtor’s property for the payment of his debts, and which conferred upon the assignee a power to give future preferences among a portion of the creditors, was fraudulent and void. One very serious objection to such an assignment is that none of the creditors among whom such preferences are to be given, can ever know what their rights are, under the assignment, where the fund is insufficient to pay all the debts; so as to render it safe for them to attempt to assert those rights in any suit or proceeding either at law or in equity. For if any one of such creditors should institute a suit to compel the assignees to account, and pay over the trust fund as directed by the assignment, such assignees would unquestionably exercise the discretion of preferring other creditors to him. .And no prudent man would subject himself to the costs of a fruitless litigation, under such an assignment for his pretended benefit. The effect of the assignment therefore is to place the creditors directly within the power of the assignees, and to compel them to acquiesce in such terms as the assignees may think proper to prescribe, as the only condition upon which they can get any part of the proceeds of the property of their debtor. And it is clearly a fraud upon the creditors, and must necessari *229 ly delay and hinder them in the collection of their debts, to place them in that situation.
Many of our most enlightened judges have regretted that the principle of permitting an insolvent to make a voluntary assignment of his property, and to give preferences in any way, should ever have been adopted. Judge Holman, of the district court of the United States for Indiana, speaks of it as <c that most iniquitous principle of the common law-recognized in most of the states, which authorizes an insolvent debtor to prefer one creditor over.another of equal or even superior merit.” Judge Judson, of Connecticut, refers to it as a principle constituting the insolvent an agent to obtain money from one and bestow it upon another, at his will and pleasure.- And Judges Story and Baldwin, of the supreme court of the United States, both condemn the principle of giving such' preferences, not merely as inequitable and unjust as it regards creditors, but as injurious in its effects upon the community. The district attorney of the United States for the district of Ohio, in his communication to the judiciary committee of the senate of the United States, says, one of the greatest evils growing out of the failures and distress of the past, has been the unjust and fraudulent assignments made by debtors in failing circumstances, by which certain creditors acquire preferences over others equally worthy; that a very large proportion of the real and personal estate in his district has, under the operation of those assignments, been tied up, the debtor remaining in possession, carrying on his business as usual, and appropriating all the proceeds of his property and earnings to the payment of some one debt to the exclusion of all others ; and that there is no limit to the fraud and injustice perpetrated by such means. (See Rep. of Jud. Committee on Bankrupt Law, Feb. 3d, 1843.) This is indeed strong language ; but it is merely a highly colored picture of some of the evils arising from the sanction which the courts have given to an erroneous principle, as injurious to the just rights of creditors as it is dangerous to the morals of the community. I cannot therefore sanc *230 tion the extension of the principle of giving preferences, in these voluntary assignments, beyond what must be considered as the settled law of the land. And I am not aware that any court in this state has ever sustained an assignment -where the insolvent debtor has not only appointed his own assignee, without the consent of the creditors, but has also invested him with the power of giving future preferences. The fact stated in the answer, that the assignees have ascertained that the assigned property will not be sufficient to pay the creditors whom the assignor has himself preferred, cannot change the character of the assignment. For when the assignment was made, the fact that the property would not be sufficient to pay the preferred creditors was not ascertained, and probably was not supposed to exist. And the assignment itself shows that the assignor contemplated the possibility of there being more than enough to pay all his debts ; as it contains an express provision for the payment of the surplus to him in that event. The failure to realize as much from the assigned property ás was originally anticipated cannot, therefore, render an assignment valid which was void at the time when it was executed.
I think the counsel for the defendants is right in supposing that the office of the deputy sheriff was vacated by the resignation of the sheriff; and that to enable the deputy rightfully to discharge the duties of the office, under the person upon whom the duties of sheriff had devolved by statute, a new appointment should have been made, by the under sheriff, in writing, and recorded in the county clerk’s office • and that the deputy should have been resworn, as directed by the statute upon an original appointment by the sheriff. (1 R. S. 379, § 74.) Under-sheriffs, and other deputies of the sheriff, being appointed only during the pleasure of the sheriff, would, by the common law, cease to be such the moment that will was determined, either by the death, removal, or resignation of the person under whom they held the appointment. (Atkins. Sher. Law, 40. Watson’s Off. of Sher. 32.) To remedy this common *231 law difficulty, so far as to provide for the discharge of the duties of the office in case of the death of the sheriff, the statute 3d Geo. 1, ch. 15, § 8, provided for the continuance in office of the deputy, or under-sheriff, until another sheriff was appointed and duly qualified. The revised laws of 1813 contained a similar provision, except that it was confined to the under-sheriff, and did not embrace all the general deputies of the sheriff. (1 R. L. of 1813, p. 420, § 3.) That statutory provision, however, only extended to the case of a vacancy in the office by the death of the sheriff. And in Paddock v. Cameron, (8 Cowen’s Rep. 212,) the supreme court decided that the under-sheriff could not execute the duties of the office where the vacancy occurred by resignation of the sheriff, or by any other cause than his natural death. The 4th section of the act of April, 1827, was therefore passed by the legislature, providing for the discharge of the duties of the office by the under-sheriff in all cases of vacancy ; and'directing the office to be executed by the coroners, where there was no under-sheriff. (Laws of 1827, p. 218.) And the substance of this provision of the act of 1827 was incorporated into the revised statutes, without extending it to any of the other general deputies of the sheriff whose office had become vacant. (1 R. S. 379, § 72.) The section of the revised "statutes which casts the duties of the office upon the under-sheriff, renders the sureties in his bond to the sheriff liable for any default or misfeasance in the office, as a counter security to the sheriff and his sureties who are responsible for the acts of the under sheriff. But no such provision is made as to the sureties of the general deputies ; and the legislature could not have contemplated the continuance in office of all the general deputies of the sheriff,- for whose official acts the under-sheriff and his sureties had never agreed to become responsible to the sheriff. The provision which has been made by the legislature, however, is perfectly just, as well as sensible, upon the supposition that the under-sheriff is to discharge the duties either in person or by deputies appointed by himself; from which deputies he may, if he *232 thinks proper, take security for the faithful discharge of the duties of the office of deputies of himself as the acting sheriff.
It is true there is a general provision of the revised statutes, to which the court was referred upon the argument, which declares that, in all cases not otherwise provided for, each deputy shall possess the powers and perform the duties attached by law to the office of his principal, during a vacancy in such office, and during the absence of his principal. (1 R. S. 117, § 7.) But the restriction of that provision to cases not otherwise provided for, prevents it from reaching the general deputies of the sheriff, whose offices, by the common law, terminate with that of their principal • except as to the completion of acts w'hich he could himself complete after the termination of his office. For as to all other duties of the office, they are otherwise provided for, in those sections of the revised statutes which cast the duties of the office of the principal upon the under-sheriff, or coroner, or person appointed by the first judge.
There is not sufficient in the admission of facts in this case to enable me to say that Poppino was defacto a deputy of the under-sheriff of Steuben county at the time the execution mentioned in the complainant’s bill was levied upon the property in controversy. Where there is but one office there cannot be an officer de jure and an officer de facto, both in possession of the office at the same time. And as the under-sheriff was in the rightful possession of the office of sheriff, a defacto deputy of the former sheriff could not levy an execution, so as to give the complainants any rights. But to make the act valid as to third persons it must appear he was defacto in the exercise of the office of a deputy of the then acting sheriff. By the common law no particular formality was necessary to be observed by the sheriff in making a deputy; and it is said he might be appointed by parol. (Dalt. 457. Atkinson, 31. Watson, 28.) And though the statute now requires the appointment of the deputy sheriff to be in writing and recorded, and that he shall be sworn before he enters upon *233 the duties of his office, I am not prepared to say Poppino might not have been considered a deputy of the under sheriff, in the present case, de facto, so as to render his acts valid as to third persons, if it had distinctly appeared that he was professedly acting as a deputy of the under sheriff, and with his knowledge and consent. For in that case a parol appointment by the under sheriff might be inferred, so as to constitute him the deputy of such under sheriff, defacto. It is probable that the stipulation was intended to go thus far in the present case. But it is merely admitted that he was appointed deputy by the sheriff, who subsequently resigned, and that he continued to act as such deputy after the resignation, under such appointment. And instead of admitting that he acted as the deputy of the under sheriff, or with his assent under an informal appointment, or with his implied sanction, it is stated, in so many words, that Poppino received no new appointment.
The question whether there was any valid levy of the execution is important to the rights of the parties in this case, so far as relates to the property seized by Poppino. For the complainants not having exhausted their remedy at law, by the return of an execution unsatisfied, they can only set aside the assignment, in this suit, so far as it affects the real estate, upon which they have obtained a lien by the docketing of their judgment, and the personal estate upon which the issuing of an execution to the sheriff of Steuben county has given them a lien j that is, the personal property, liable to execution in that county, which remained in the hands of the judgment debtor, or of his assignees, when the execution was delivered to the proper officer to be executed. (Beck v. Burdett, 1 Paige's Rep. 308. Mohawk Bank v. Atwater, 2 Idem, 58. McElwain v. Willis, 9 Wend. Rep. 548.) In this case the defendants state that they have paid off an execution, which was a previous lien upon this personal property for more than its whole value. And if the property is disposed of and converted into money before the complainants can get a lien upon it by the issuing of a new execution, it is probable they may be pro *234 tected from loss, upon the principle adopted in the case of Wakeman v. Grover, (4 Paige’s Ref. 24.) But if the execution is properly levied upon such property before it gets into the hands of a bona fide purchaser, all that this court can do is to set aside the assignment as fraudulent, and let the law take its course. The defendants therefore are excusable in this case in availing themselves of a technical objection, to the right of the_officer to levy the execution, to avoid such a result.
All that the court can do in the present case is to declare the assignment fraudulent and void, as against the complainants, so far as it purports to assign or convey to the assignees any real property of the defendant Halliday, upon which the judgment of the complainants is a lien, or would have been a lien if such assignment had not been made, and which had not been conveyed by Halliday to a bona fide purchaser at the time of docketing the judgment. And as to all the rest of the property embraced in the assignment the bill must be dismissed, without prejudice to any rights which the complainants, or the supposed deputy, may have at law; or to any rights which the complainants may have in this court to set aside the assignment as to the residue of the property, after a new execution shall have been issued, so "as to obtain a lien upon the assigned property, or after an execution shall have been issued to the proper oEcer and returned unsatisfied. Such a decree will protect both parties in all their legal and equitable rights, so far as it is proper to protect them, and without disturbing any settled principle. And, under the circumstances, this appears to be a proper case to leave the parties respectively to pay their own costs.