BURDICK *vs.* POST and HUNTTING

An assignment of property, by debtors, for the benefit of their creditors, which provides that the assignee shall take possession of the property assigned, and sell and dispose of the same, at public or private sales, to such persons, for such prices, and on such terms and conditions *for cash or upon credit,* as in his judgment may appear best for the interest of the parties concerned, and convert the same into money, is void, by reason of the clause conferring power to sell *on credit.* BROWN, J. dissented.

Assignments, preferring certain creditors, are only tolerated when they are absolute and unconditional; when they devote the whole of the assignor's property to the immediate and unqualified payment of his debts, *pari passu,* or in a specified order; when they contain no reservations or conditions for the benefit of the grantor; and when they are free from provisions calculated to extort from the fears of the creditor a compromise, discharge, or other favor.

A clause authorizing a sale *on credit,* vitiates an assignment, on the same principle, and for the same reason, as would a provision directing the assignee to wait twelve months before proceeding to execute his trust. *Per* BAR-CULO, J.

*Nicholson* v. *Leavitt,* (4 *Sandf. S. C. Rep.* 252,) disapproved.

A former suit is a bar only to such claims, or matters, as might have been litigated *under the pleadings and issue as made.*

THIS was an appeal from the decision of Mr. Justice McCoun, made at the special term held in Suffolk county, on the 2d of September, 1850, denying the motion of the appellants, who were defendants in the suit, to dismiss the complaint of the respondent, the plaintiff in the suit, and adjudging that the assignment from G. & H. Huntting to the defendants, set out in the pleadings, was fraudulent and void as against the respondent, the plaintiff in the suit, for the reason that it authorized the

assignee to sell upon credit ; and directing the plaintiff's judg-
ment against the assignors, to be paid by the assignee out of
the assigned property in his hands.

The appellant, Henry H. Huntting, and his partner, Gilbert
C. Huntting, (now deceased,) composing the then firm of G. &
H. Huntting, made an assignment, bearing date the 18th of Sep-
tember, 1848, to the appellant, William R. Post, as trustee, of
all their estate, real and personal, belonging to them as individ-
uals or as members of said firm, or to which they, or either of
them, might in any manner be entitled, wheresoever the same
might be situated, in trust, for the payment of all their debts,
in equal proportions, after paying out of the partnership prop-
erty, in the first place, such debts as the said firm owed to Rob-
ert B. Fordham and Oscar H. Fordham, the clerks of said firm.
The assignment authorized the assignee " to take possession of
all the lands, property and estate hereby assigned to him, and
sell and dispose of the same at public or private sales, to such
persons, for such prices, and on such terms and conditions, for
cash or upon credit, as in his judgment may appear best for the
interest of the parties concerned, and convert the same into
money. '

At the time of the assignment, the respondent, William Bur-
dick, was indebted to the firm of G. & H. Huntting, in the sum of
$206,94, with interest from the 23d of July, 1847 : on the 4th
of October, 1848, the appellant, Post, as assignee of G. & H.
Huntting, demanded payment of the debt from the respondent,
Burdick, who professed his willingness to pay the same, and
tendered a note of the said G. & H. Huntting, payable to Howes
Crowell or order, for $200 with interest, indorsed by the said
Crowell, and of which he claimed to be the bona fide holder, al-
ledging that there was then due on that note $221,20 ; and
offered to pay the remainder then due from him, being $5,19, to
the respondent Post, as such assignee ; who refused the offer on
the ground that the note was not transferred to Burdick until
after the assignment.   In March, 1849, the appellant, Post, as
the assignee of G. & H. Huntting, brought a suit in the supreme
court, against the respondent, Burdick, for the debt above men-

tioned; who, in his answer, in that suit, set up his offer to pay the assignee in the manner above stated, and he brought the balance of $5,19 into court. The reply alledged, that the note so offered to be set off, was not transferred until after the assignment made by G. & H. Huntting, and that the tenders of the balance, were not made until November, 1848. The suit was tried in June, 1849, before a jury, who found a verdict for the appellant, Post, the plaintiff in that suit, and judgment was, thereupon, rendered against Burdick, the defendant therein, for $277,37.

Burdick brought a suit in the supreme court, against the appellant, Henry H. Huntting, and Gilbert C. Huntting, and on the 16th June, 1849, recovered against them for $223 damages, and $12,05 costs. And on the 4th February, 1850, he brought his suit in the supreme court, against the appellants, Henry H. Huntting, as surviving partner of the late firm of G. & H. Huntting, and William R. Post, as assignee of the said firm, setting forth his judgment so recovered; the issuing of an execution thereon, and the return of the same unsatisfied; the assignment by G. & H. Huntting to the appellant, Post; that no dividend had been made; that the property assigned was large: that by reason of the assignment he was hindered and delayed in receiving his debt; and that the same assignment was fraudulent and void, and made with the intent to hinder and delay and defraud creditors of their lawful suits, debts and demands; asking that the same might be set aside and declared fraudulent and void: and, that his judgment might be declared a lien on the real estate assigned, and that he might be declared entitled to payment out of the personal property in the hands of the respondent, William R. Post; that a receiver might be appointed; and that his costs and charges be paid with his judgment; and for further relief. To this complaint the appellants put in separate answers, both substantially the same, denying fraud, and alledging that the assignee had paid the preferred creditors $2795,39; and had paid to the other creditors fifty-five cents on the dollar, to the amount of $23,933,69, leaving debts to the amount of about $1637, on which nothing had been paid, some of such creditors

Burdick *v.* Post.

having assented to the assignment. The answers also admitted that there was property sufficient in the hands of the as-signee to pay the claim demanded in the complaint; but pleaded in bar that the respondent, Burdick, was estopped from alledging that the assignment was void as to him, because of the action brought against him by the assignee, the pleadings therein, and the judgment rendered. No reply was put in, to these answers; and a motion was made at the special term to dismiss the complaint; the motion was denied, and this appeal thereupon brought.

*G. Miller*, for the appellants.

*S. L. Gardiner*, for the respondent.

BARCULO, J. We would have been content with a silent affirmance of the judgment rendered at the special term, in this case, upon the authority of *Barney* v. *Griffin et al.* (2 *Comst.* 365;) but the more recent case of *Nicholson* v. *Leavitt*,(*a*) in the superior court of the city of New-York, has been pressed upon us as a counter and paramount authority; and as one of the members of this court now dissents from our conclusions, we feel constrained to set forth our reasons for concurring with the former, and rejecting the latter decision.

The assignment in question provides that the assignee " shall take possession of all the lands, property and estate hereby assigned to him, and sell and dispose of the same at public or private sales, to such persons, for such prices, and on such terms and conditions, *for cash or upon credit,* as in his judgment may appear best for the interest of the parties concerned, and convert the same into money." That such an assignment is void, for the reason that it purports to empower the assignee to sell on credit, is expressly decided in *Barney* v. *Griffin*, if we take the opinion delivered by Judge Bronson as evidence of the decision of the court.

But it is said, by the learned judge, (Duer,) who wrote the

(*a*) Reported in 4 *Sandf. Sup. Court Rep.* 252 *to* 311.

elaborate opinion in *Nicholson* v. *Leavitt*, that that portion of the opinion of Judge Bronson, touching the question here involved, was not adopted nor sanctioned by his brethren of the court of appeals. Assuming this statement to be correct, and, also, that it is legitimate and proper for one court to go behind the published reports of another, to ascertain the views entertained by individual judges, we will proceed to consider the question without reference to that adjudication, first upon *principle*, and secondly upon *authority*.

I. To test the matter, as one of principles, we must compare the conveyance with the statute, and ascertain whether, upon a fair construction of the two, they are found to conflict with each other.

Our statute of frauds(*b*) pronounces void, all conveyances or assignments " made with the intent to hinder, delay or defraud creditors or other persons of their lawful suits, damages, forfeitures, debts or demands." This section is obviously aimed at three things, which its authors supposed debtors might be tempted to do, for the purpose of avoiding or deferring the payment of their debts. They may dispose of their property in such manner, as to interpose obstacles to legal process, with intent to hinder creditors in the collection of their demands ; or to *delay* payment to some future period ; or to *defraud* them, by absolutely defeating all attempts to enforce their claims. An assignment or conveyance made for *any one* of these purposes, is declared to be *void*. Such is the plain import of the statute.

We now turn to the instrument before us, to see whether it contemplates any of these unlawful objects. It professes to authorize the assignee to sell the property upon such terms and conditions for *cash or credit*, as in his judgment may appear best for the interest of the *parties concerned*. What is to be the effect of such a trust upon the rights of creditors, if it be permitted to stand, and be carried into effect? In the first place, it puts the property beyond the reach of ordinary legal process. In the second place, it leaves it there until the assignee shall determine to sell, which may be a delay of at least

(*b*) 2 *R. S.* [137] *part* 2, *chap.* 7, *tit.* 3, § 1.

some months. In the third place, the creditors, after having thus awaited the sale, may be put off and kept at bay during an indefinite period, until the expiration of the term of credit, which, in his unlimited discretion, the assignee may have seen fit to give on the sale; which, in all, may amount to a ruinous postponement of the claims. All this may be done within the letter and spirit of the deed, by consulting the interest of the " parties concerned," *quorum magna pars fuit debitor.* The creditors may thus be set at defiance for years; and the law presumes that the assignor *intended* to accomplish all that the instrument provides. (*Mead* v. *Phillips and · others,* 1 *Sandf. Ch. Rep.* 87.)

Is not such a provision calculated to hinder and delay creditors? Clearly so. For by the common legal forms a debt can be collected by execution in sixty or ninety days. The creditor can recover a judgment, seize and sell the effects of his debtor, and obtain his money long before the assignee is required, by the tenor of this instrument, to determine whether it is for the benefit of the " parties concerned," to sell at public or private sale, for cash or credit.

But it may be said that, even under such a deed, the long delays here described would not be tolerated; but that a court of equity would remove the trustee or expedite his proceedings. This might, or might not, be the case. If the deed is valid, his discretion must be uncontrollable, so long as fraud or collusion can not be truly charged against him. And, in times of commercial distress, it would be no difficult matter to show, that deferring the sale or time of payment for months, or even years, would be *apparently* beneficial to all the parties; and that, in the exercise of a sound discretion, he could not sooner convert the property, according to the true spirit of his authority. Under such circumstances the courts could not interfere, but must leave the creditor to the mercy of this plausible discretion.

It is true, that it may be said, that the creditors can not be injured by a delay in such a case. The answer to this is, that the creditor is to be his own judge of what is best for himself. The law gives him the right to determine whether he will grant

further indulgence. If he chooses to enforce his demands at an unfavorable season, when the whole amount can not be realized, it is his own folly. He has the right to do as he pleases ; and the statute under consideration secures him against any intentional delay in the prosecution of that right. Besides, we can not certainly say that he will be benefited by waiting and receiving a larger dividend at a future time. He may be plunged into bankruptcy himself, by the very postponement devised for his benefit. It is no uncommon occurrence for men to be *ruined* by the *benefits forced upon* them by others.

We are, therefore, unable to discover any *principle* upon which this assignment can be sustained.

We are not, however, unmindful that our reasoning, carried out to its legitimate extent, would lead to a conclusion adverse to *all* assignments by insolvents, giving preference to favored creditors. We freely admit that such is the tendency of our remarks, as well as the conviction of our minds. In these views we are sustained by the recorded opinions of many of our most eminent jurists. Even the learned judge in *Nicholson* v. *Leavitt*, (4 *Sandf. Ch. Rep.* 282,) most eloquently deplores the existence of the law, which " tends to injustice and tempts to fraud," and of which he says, until it " shall have been altered by the action of the national or state legislature, our jurisprudence must remain liable to the reproach that we are the only nation in the civilized world, in which a merchant, knowing or contemplating his insolvency, is allowed to place his whole property beyond the reach of the body of his creditors, by devoting its avails, principally or exclusively, to the satisfaction of the claims of a few. In every civilized country but our own, it is not only a truth in morals, but a rule in law, that the property of an insolvent debtor belongs to his creditors in the proportion of their debts, and that every disposition made by him in contravention of their equal rights, is null and void." While we concur in these observations, we must confess our utter inability to recognize the consistency, or discover the principle which can reconcile the denunciation of the existence of this evil, with a decision directly calculated to propagate and increase it. But,

Burdick *v.* Post.

although we may all agree in condemning these preference-giving assignments, we must also admit that the law permitting them is established upon a foundation which can not now be disturbed by judicial action. The point of difference is, as to the precise extent to which an insolvent can, or ought to be allowed to go, in discriminating between creditors, and indulging his caprice or prejudice in the disposition of his property. We suppose that this inequitable privilege should not be further enlarged or extended ; but that, being an admitted evil, it should be confined within the smallest possible circle, consistent with previous adjudications.

II. We now come to consider the case upon *authority*. As we understand the settled law in this state, derived from an examination of all the decisions, *assignments preferring certain creditors are only tolerated when they are absolute and unconditional ; when they devote the whole of the assignor's property to the immediate and unqualified payment of his debts, pari passu, or in a specified order ; when they contain no reservations or conditions for the benefit of the grantor ; and when they are free from provisions calculated to extort from the fears of the creditor, a compromise, discharge, or other favor.*

In support of this doctrine we remark, in the first place, that in some of the earliest reported English cases, on this subject, the assignment provided for an equal distribution among all the creditors. The courts therefore, notwithstanding the statute of frauds, upheld them upon the ground of the manifest justice of securing an equal distribution of the insolvent's effects, undiminished by the expense of litigation. The case of *Pickstock* v. *Lyster*, (3 *M. & Sel.* 371,) was an instance of that kind, in which Justice Bayley says, " the conveyance, so far from being fraudulent, was the most honest act the party could do ; not having sufficient to satisfy all his debts, he proposes to distribute his property in liquidation of them." Although it is to be regretted that the maxim *obsta principiis* was not, before, applied, we can very well conceive that a plausible reason might be given for deciding that such an assignment did not fall within the statute of frauds. For there was not, in the nature of the transaction

itself, any necessary delay or hindrance opposed to the creditors. A faithful and vigilant trustee can, in many instances, sell the property, and pay the debts, as soon as they can be collected by the sheriff. There is no good reason why it should not be done, although, in practice, it is admitted to be far otherwise. It might, therefore, with considerable plausibility, be said that such a conveyance did not "hinder or delay," and if the debtor fairly surrendered his whole property, it is difficult to see how an intention to "defraud" could be predicated.

We find however that, at an early day, the right of giving preferences was sanctioned by our courts. In 1808, Van Ness, justice, recognized it as the settled law in this state, (*McMenomy & Townsend* v. *Ferrers*, 3 *John.* 84;) and in 1810 the supreme court decided the precise point, "that a debtor might lawfully prefer one set of creditors to another." (*Wilkes and Fontaine* v. *Ferris*, 5 *John.* 344.) The reason why this right of preference has been allowed to the debtor is, according to Senator Tracy, in *Grover* v. *Wakeman*, (11 *Wend.* 218,) "that whilst the property is in his hands unshackled of legal liens and incumbrances, his power over it is absolute, and as he can dispose of it by sale to any person, so he may dispose of it by way of satisfaction to any creditor." Assuming this to be the true reason, we may here observe, that it has no application to the case of authorizing the trustee to sell on *credit*. For, although it is admitted, that a debtor may dispose of his estate by a *bona fide* sale, and apply the proceeds, himself, in payment of his favorite creditors; yet it is equally clear that he would not be permitted to sell his estate on a long credit, and postpone his creditors until the receipt of the purchase money. On the contrary, a court of equity would, undoubtedly, either set aside the sale, or, affirming it, cause the securities taken for the consideration, to be converted immediately into cash, and applied to the payment of debts.

The rule authorizing preferences had, however, hardly become established .ere the courts, perceiving the dangerous power, vested in failing debtors, of rewarding friends, and punishing exacting or importunate creditors, began to regret its admission,

and exercise their ingenuity in imposing limitations and restrictions. Thus in *Riggs* v. *Murray*, (2 *John. Ch.* 565,) Chancellor Kent held the following language : "The application of the rule is always to be watched with jealousy, and we are not required, by any reasons of expediency or justice, to enlarge the rule by giving it a new and dangerous facility. We ought to require of the insolvent, when he undertakes to make preferences, by assignments in favor of a class of honorary or privileged creditors, that he should do it absolutely and definitively, and not make the assignment to depend upon his future will and pleasure."

In *Grover* v. *Wakeman*, (11 *Wend.* 195,) Justice Sutherland says, "Whenever they depart from the simplicity of a direct and unequivocal devotion of the property of the assignor to the payment of his debts, and contain reservations and conditions intended for his ease and advantage, they are viewed with considerable, and I think I may add, in view of the course of judicial decisions in this state, with increasing distrust." Again he adds, (page 202,) "It is time that some plain, simple, but comprehensive principle should be adopted and settled upon the subject. In the absence of a bankrupt law, the right of giving preferences must probably be sustained. Let the embarrassed debtor, therefore assign his property for the benefit of whom he pleases ; but let the assignment be absolute and unconditional ; let it contain no reservation or conditions for the benefit of the assignor ; let it not extort from the fears and apprehensions of the creditors, or any of them, an absolute discharge of their debts as the consideration for a partial dividend ; and, above all, let it not put up his favor and bounty at *auction*, under the cover of a trust, to be bestowed on the highest bidder." In the same case Senator Tracy remarks, (page 222,) "If a debtor be allowed to proceed beyond the single purpose of paying his debts, it is not easy to foresee at what point he can be arrested. The only safe rule is, to regard every assignment which operates to delay creditors for any purpose whatever, not distinctly calculated to promote their interest, as contrary to the policy of the statute of frauds." And, in *Boardman* v. *Halliday*, (10 *Paige*, 229, 230,) Chancellor Walworth declares that he can not "sanc-

tion the extension of the principle of giving preferences, in these voluntary assignments, beyond what must be considered as the settled law of the land." Not only has the language of our judges been adverse to the extension of this power, but the tendency of the adjudications on the subject, for the last thirty years, has been, to confine the insolvent within the narrow limits we have defined; and which, it is hardly necessary to add, clearly exclude the power of giving discretionary credit.

We find that, in *Hyslop* v. *Clarke*, (14 *John.* 458,) the supreme court decided that the assignment was rendered void by a provision reserving to the assignor the power thereafter to designate the creditors who should receive the avails, in case those first designated should refuse to execute a release on receiving their proportionate shares. In *Austin* v. *Bell*, (20 *John.* 442,) the same court held, that where the deed contained a proviso that in case any of the creditors named should not within the time limited in the deed, which contained a release of the debtor from his debts, become parties to it, the share or proportions of such creditors so neglecting or refusing to execute the deed should be paid by the trustees to the assignor himself, the deed was fraudulent and void under the statute of frauds. So in the case of *Grover* v. *Wakeman*, (11 *Wend.* 187,) a like decision was made by the court of errors, affirming a decree of the chancellor, where the assignment contained a provision giving a preference to certain creditors, to depend upon the execution by them of a release to the debtor of all claims against him. *Mackie* v. *Cairns*, (5 *Cowen*, 547,) was a case where one of the deeds declared a trust to pay a certain sum annually for a limited time to the debtor. The court of errors determined that this reservation rendered it void. In *Boardman* v. *Halliday*, (10 *Paige*, 223,) the assignor attempted to clothe the trustees with authority to apply a portion of the proceeds to the payment of such creditors as the *trustees should think proper*, which the chancellor held to be in violation of the statute.

This subject, in various aspects, according to the cunning devices invented by fraudulent debtors, was brought before the late assistant vice chancellor of the first circuit. That distin-

Burdick v. Post.

guished jurist had occasion, within a few successive months, to pronounce against the validity. of assignments in six different cases, as reported in 1 *Sandford's Ch. Reports*; among these was the case of *Van Nest* v. *Yoe*, (*Id.* 4,) where the assignment was executed with a view of having the effects of the assignors turned to the best account, and to have them, or the proceeds thereof, applied to the payment and satisfaction of their debts and liabilities, so far as the same were necessary for that purpose; *it appearing that at the time of its execution the assignors supposed they were solvent and would have a surplus.* In *Mead* v. *Phillips et al.* (*Id.* 83,) it was held that an assignment was void against creditors, where it first provided for the payment of all costs and expenses necessarily incurred by the assignee in defending any suits that might be instituted against him by any creditor or other person, for any thing growing out of the assignment, or in any way connected therewith. And in another case an insolvent debtor, on the eve of making a general assignment, transferred a bond and mortgage in trust for the benefit of certain of his creditors. The bond and mortgage were not payable until four years thereafter. The transfer contained a proviso, that the assignee should retain the bond and mortgage until the expiration of the period it had to mature, and should not part with, or attempt to collect, the principal until that time. The transfer was held to be fraudulent as against creditors, on the ground that it carried upon its face an intent to hinder and delay them. (*Storm et al.* v. *Davenport, Id.* 135.) The vice chancellor said the. law "will not tolerate, in such assignment, any restriction or limitation upon the immediate sale or conversion of the property for the benefit of the creditors. Some latitude and discretion is necessarily vested in assignees in this respect; but delay in the conversion of the assets is looked upon with suspicion and distrust; unless explained, it is a badge of fraud; and if such delay be stipulated for in the assignment itself, it is evidence of a fraudulent intent in the execution of the instrument."

These authorities establish, in our judgment, the proposition with which we started: and bring us to the conclusion, that the

assignment before us is condemned both by principle and authority, by reason of the clause conferring power *to sell on credit.(c)*

If it be true as is alledged, that the other members of the court of appeals withheld their assent from a portion of the views expressed by Judge Bronson, in *Barney* v. *Griffin,* we presume it was done, not because they actually dissented, but because an opinion upon the point was not necessary to the decision of that case.

This investigation has already been pursued for beyond the limits originally designed. We do not, however, feel at liberty to dismiss the case without adverting to a few of the counter positions taken by Judge Duer, which although fortified by much plausible and elegant reasoning, we, having examined, are compelled to reject as untenable.

1. It is broadly stated that the necessary effect of every assignment made by an insolvent, even where the debts are to be paid *pari passu,* is to hinder and delay creditors. Now that such delay may *often be* the effect we shall not undertake to controvert: but that it is the *necessary* effect, or that it is a consequence apparent upon the face of the conveyance, we most confidently deny. Take a simple assignment, in which the debtor conveys his property absolutely to the assignee with instructions to convert the same into money and apply it in payment of debts. Is there any thing in such an instrument that imports or implies necessary delay? Certainly not. If the estate is reasonably small, there is nothing in the nature of the business itself, that requires any delay. In fact an assignee *can* proceed even more expeditiously than a sheriff on execution: for the latter is required to give the statutory notices of sale, which the former may abridge or dispense with. And, whether the estate is large or small, there is no apparent reason why an assignee can not sell as well, and as soon, as an officer. No one therefore, merely looking at the deed, can certainly say that it must operate to hinder or delay any creditor. That it often does so operate is an undisputed and lamentable verity;

(c) See *Whitney* v. *Krows,* (11 *Barb.* 198.)

but the fault is, in most cases, that of the particular trustee. The remedy for this the courts should apply by quickening his motions with prompt and vigorous applications ; or by removing the trustee and appointing a receiver in his place, as was done by the chancellor in *Hart* v. *Crane*, (7 *Paige*, 37) saying: " it was the duty of the assignee to proceed and sell the property either at public or private sale without delay, and to pay over the proceeds thereof to the creditors." And, " that it would be a fraud upon them, if, by the terms of the assignment, the assignee was directed to delay the sale for the purpose of obtaining higher prices for the property, unless by the consent of the creditors ;" that, " it was a breach of trust on the part of the assignee to delay the sale of the property for the purpose of retailing it out for higher prices."

It is quite a different matter when the conveyance itself *provides* for a delay. And this we apprehend to be the true distinction between lawful and unlawful assignments in this respect. The former, although they may, owing to the peculiar state or situation of the property, *occasion* some incidental delay, do not *require* or authorize it, in terms. The latter contains provisions which call for delay, and which, if carried into effect, as we are bound to assume they will be, do *necessarily by their own operation*, cause a hinderance or delay ; and, therefore, all these are illegal. For this reason a simple assignment is valid ; while an assignment which directs the trustee to wait twelve months before proceeding to execute his trust, is plainly and manifestly invalid. Upon the same principle, and for the same reason, a clause, authorizing a sale on credit, must vitiate the instrument.

2. It is also said, that the insolvent in making a simple assignment, *means* to hinder and delay his creditors, and yet it is good. The answer to that allegation is, that it is a great mistake to suppose that any assignment is *unimpeachably good ;* and whenever it is admitted, or proved, that the conveyance was made with the motive and object of accomplishing such purposes, it is the plain duty of every tribunal to adjudge it illegal and void. For, although such a conveyance may be fair upon

its face, it is always liable to be impeached by evidence *dehors ;* and whenever a jury, or a court sitting to try questions of fact, are satisfied, by the evidence, that it was made with intent to hinder, delay, or defraud, they must pronounce against it, or disregard the statute, and violate their duty. For myself, when causes involving this question are tried at the circuit, and there is extrinsic evidence offered tending to show an improper design in making the assignment, I always submit it to the jury to determine the actual motives of the assignor; whether his object was merely to punish some particular creditor or creditors, which would be illegal; or whether he was influenced by a desire and intent only to save and protect more favored creditors, which is lawful, and if, under a state of facts which sometimes appears, *i. e.* an assignment made the day before the judgment or execution of some inexorable creditor, whose claim the assignment postpones until all the other debts are paid, and cotemporaneous declarations of hostility or threats of vengeance on the part of the debtor; the jury conclude to find against such a conveyance, I have yet to learn that any court in this state would disturb the verdict. I am aware that the case of *Pickstock* v. *Lyster,* is supposed to be inconsistent with this practice. But that can hardly be considered an authority on that point, if we rely on Baron Richards, who in *The King* (in aid of Braddock) v. *Watson,* (3 *Price,* 16,) says: "that as far as the facts in the case of *Pickstock* v. *Lyster* were brought before the court of king's bench, the decision was right. But that he had no doubt on the trial, that the deed was executed under unfair circumstances, and with an intention to defraud the judgment creditor. One fraudulent part of the case, which was left to the jury, was, that the deed was executed just as the execution was coming in. On the merits, therefore, that was a bad decision. But that case was decided in the court of king's bench, on the other ground of the assignment being for the equal benefit of all the insolvent's creditors." If, however, that case does decide what is claimed for it, that the jury can not find against the validity of an assignment good on its face, I can only say, in the language of Senator Colden, in *Mackie* v. *Cairns,* (5 *Cowen,* 569,) speak-

Burdick v. Post.

ing of *Lord Abingdon's case,* (c) (5 *Term Rep.* 420,) "I find nothing in the decision of the court of king's bench, that commands my respect, and I owe no obedience to it."

3. It is also charged that we re-establish the doctrine of constructive fraud, or fraud in law. This allegation can only be made upon the supposition that the assignor did not in *fact* intend to delay or hinder his creditors—a supposition which is altogether unfounded. On the contrary, we determine as a *matter of fact,* that the assignor *did intend* to hinder and delay his creditors. We say that the conclusion is irresistible, from the provisions requiring delay, that his real design was delay ; that in the language of Judge Duer, "it was an intent actually existing in the mind of the party at the time of the performance of the act which it is alledged to vitiate." We find it as a fact, the same as we find the *factum* of execution from proof of signing and sealing the deed. The intent is found the same as the intent is found in hundreds of other cases, civil and criminal, where it is inferred that a man intends to do what his deliberate conduct plainly, distinctly, and inevitably tends to accomplish.

4. And, finally, it is declared to be inconsistent to determine that an *express* authority to sell on credit destroys the deed, when an *implied* authority always exists ; and while it is a rule of equity, as well as of the statute, to allow the sale of trust estates, and of insolvents' estates, upon credit. To this we reply, in the first place, that the existence of the implied power is very questionable ; and, in the second place, if it exists at all, it is a different power from that contained in the assignment, as is manifest from the disposition evinced by debtors to insert the express authority, as well as from the consideration that the implied authority must always be under the direction and control of the court. That it is usual to insert in a decree for the sale of trust property by a receiver, a right of selling on a reasonable credit, when circumstances seem to require it, is not disputed. But is there not a broad distinction between that and the present

(c) The title of this case as reported both in 4 *Term Rep.* 420, and 2 *Anstruther,* is, in the first, " *Estwick* v. *Caillaud ;*" and in the second, on a bill filed in the exchequer for an injunction, " *Caillaud* v. *Estwick.*"

case ? The receiver is the officer of the court, appointed by, and amenable to the court. He is not selected by the debtor, but by the court, on the nomination of the creditors, or on its own motion. Nor can any order touching the disposition of the estate be made, without giving the creditors an opportunity of being heard. But the assignee is the chosen friend of the insolvent; too often, his mere tool, and always more or less under his influence; independent of the creditors; not even bound to apply to the court for aid, direction, or authority as to the mode of selling, or the length of credit. So also, in regard to the statutory trustees of the estates of non-resident, absconding, and insolvent debtors. They are appointed by the officers of the law; are not, in any respect, the agents or nominees of the debtor; and are, therefore, entirely removed from those improper influences which lead to the frequent abuse in the management and disposition of the effects of an insolvent under the ordinary voluntary assignments. The case mentioned, of executors or administrators selling under an order of the surrogate, stands also upon essentially different ground. But even in these cases of judicial sales, the statute does not give full discretion, but imposes limitations as to the term of credit. In our judgment, no ordinary assignee should ever sell on credit, without obtaining leave from the court, on application, with notice to the *cestuis que trust,* or obtaining their consent. (*Hart* v. *Crane,* 7 *Paige,* 37.)

There is another point in the case, as to the effect of a former suit in bar of the present. It is unnecessary to notice it, further than to say that we agree in the conclusion that there is nothing in the papers which show that the *validity* of the assignment was in issue in the former suit. That it might have been put in issue is possible, but that it was not is certain; and the rule, as we understand it, is, that a former suit is a bar only to such claims, or matters, as might have been litigated under the *pleadings and issue as made.*

The judgment rendered at the special term must therefore be affirmed.

MORSE, J. concurred.

Burdick v. Post.

BROWN, J. The question involved in this cause, is of suffi-
cient consequence to justify an exposition of the reasons which
lead me to dissent from the judgment of my brethren. The
plaintiff, William Burdick, is a judgment creditor, with an exe-
cution returned unsatisfied, of the defendant, Henry H. Huntting
and Gilbert C. Huntting, deceased; who composed the late firm
of G. & H. Huntting; and the object of the suit is to set aside,
and have declared void, a deed of assignment executed by the
Hunttings to the defendant, William R. Post, of all their estate,
real and personal, in trust for the payment of debts, upon the
ground of fraud; and to have the judgment satisfied from the
proceeds of the trust property. The cause was heard at the
special term, and judgment given for the plaintiff. No proof
was produced, upon the trial, but the deed was held to be fraud-
ulent and void, as against the creditors of the grantors, solely
because the trust to sell was in the following words, to wit;
"that is to say, the said party of the second part shall take pos-
session of all the lands, property and estate hereby assigned to
him, and sell and dispose of the same at public or private sale,
to such persons, for such prices, and on such terms and condi-
tions, for cash or upon credit, as in his judgment may appear
best for the interest of the parties concerned, and convert the
same into money." No other exception is taken to the deed: It
appoints and declares the uses for which the property is to be
held, and to which it is to be applied. It reserves nothing what-
ever to the grantors, except such articles of personal property
as are exempt, by law, from levy and sale upon execution, until
all the debts are fully paid. It devotes the entire estate to the
satisfaction of the debts, and imposes no terms upon the cred-
itors, as a condition upon which they are to participate in the
distribution of its proceeds. The fraudulent intent is to be in-
ferred, solely, from the authority given, to sell upon such "terms
and conditions, for cash or upon credit," as, in the judgment of
the trustee, may appear most beneficial to the creditors.

The statute declares void " every conveyance or assignment in
writing, or otherwise, of any estate or interest in lands, goods,
or things in action, &c. made with intent to hinder, delay or de-

fraud creditors." Such was also the provision of the statute of the 13th Elizabeth, which was held to be declaratory of the common law. To defraud, is to withhold from another that which is justly due to him, or to deprive him of a right, by deception or artifice. In their legal signification, the words hinder, delay and defraud, as used in the statute, are substantially synonymous. The question of fraudulent intent is no longer a question of law, for the 4th section of the title of the statute, in regard to general provisions respecting frauds, declares it to be a question of fact. When it is before a tribunal in which questions of fact are to be tried by a jury, it must be found by a jury; but in all actions, equitable or otherwise, tried without a jury, the question of fraudulent intent must be determined by the court. (*Cunningham* v. *Freeborn*, 11 *Wend.* 240.) It is a fact, nevertheless, to be established upon the trial, by proof; and the burthen is cast upon the party impeaching the deed. "A fraudulent intent is never to be presumed; and where an instrument is ambiguous in its terms, and admits of two constructions, that interpretation should be given to it which will render it legal and operative, rather than that which will render it illegal and void." (*Grover* v. *Wakeman*, 11 *Wend.* 193.) It need not appear that the parties were actually moved by a fraudulent design, at the time the instrument was executed; as if its provisions have the effect to "hinder, delay or defraud creditors," the intent will be presumed; for, without such presumption, there would be no sufficient foundation, upon which the rights of creditors could stand for protection. The fraudulent intent may appear from circumstances, dehors the deed; as the absence of a sufficient consideration; the relation which the grantee holds to the grantor; or the want of an actual and continued change of possession: or it may appear upon the face of the instrument itself, in limitations, and provisions tending to hinder, delay, or defraud creditors. Evidence of fraudulent intent, derived from the deed itself, may be classed under three different and distinct heads. 1st. Where it reserves some portion of the assigned property, or a part of the interest, or income thereof, to the use of the debtor, or his family, during the time required for the

execution of the trust, or for any other period of time, as was done in the deeds referred to in *Murray* v. *Riggs*, (15 *John.* 571 ;) *Austin* v. *Bell*, (20 *Id.* 442 ;) *Mackie* v. *Cairns*, (5 *Cowen*, 547 ;) or where it directs that the surplus, after paying certain specified creditors, shall be returned to the assignor, leaving other debts unsatisfied, as was done in the assignments in controversy in *Goodrich* v. *Downs*, (6 *Hill*, 438 ;) *Barney* v. *Griffin*, (2 *Comst.* 365.) 2d. Where it imposes terms upon the creditors, as a condition upon which they are to participate in the distribution of the assigned property, or where it creates any trust which is to operate by way of coercing the creditors into a release of a part of their claims, as were some of the trusts of the deeds, in litigation in *Hyslop & Campbell* v. *Clarke et al.* (14 *John.* 458 ;) *Austin and others* v. *Bell*, (20 *Id.* 442 ;) *Grover and others* v. *Wakeman*, (11 *Wend.* 187 ;) or where it reserves to the assignor the right to appoint the uses to which the property is to be applied at a future time, as was also done by one of the trusts in the deed in *Hyslop & Campbell* v. *Clarke and others.* 3d. Where the deed postpones to a future, definite period, the time for the sale of the trust property, or for the distribution of its proceeds; or where it creates a trust, to sell after the lapse of a certain period of time, or by any other provision suspends the power of the trustee to apply the estate, without delay, to the payment of the debts. The effect of trusts of this character, is too obvious to admit of a doubt; and their presence, in a deed of assignment for the payment of debts, would justify the inference, and afford unequivocal evidence, of a fraudulent intent.

The deed from the Huntings to Post, is free from all these objectionable features. The uses are appointed and declared. There are no stipulations or reservations for the advantage of the assignors; and no part of the proceeds of the estate is to be paid to them, until the debts are paid. No terms are imposed upon the creditors. They are not required to relinquish any part of their claims, nor to suspend any legal remedies which the law affords for their collection. There are no limitations, or restraints, upon the power of the trustee to proceed at

once to dispose of the property, and convert the same into money. The clause which gives him authority, to sell, for cash, or upon credit, clothes him with no additional power, and subjects him to no new restraint. It leaves him to exercise the same discretion, in conducting the sales, and prescribing the terms, as he would have exercised, if the clause had been entirely omitted. The rule that fixes the responsibility of a trustee, may serve to show the extent of his power in the sale and disposition of the trust property. "Where a trustee," says Mr. Story, "has acted with good faith, in the exercise of a fair discretion, and in the same manner as he would ordinarily do in regard to his own property, he ought not to be held responsible for any losses accruing in the management of the trust property." (*Eq. Juris.* § 1272.) This rule has some exceptions; but none that affect the present question. So long as the trustee acts in good faith, in the exercise of a fair discretion, and in the same manner as he would ordinarily do, in regard to his own property, so long is he within the line of his duty. A sale upon a reasonable time of credit, taking the usual security, is an act of good faith. It is the exercise of a fair discretion; for it is precisely the same thing that prudent men usually do in regard to their own property. If a trustee may sell upon credit within the line of his duty, an authority given him to sell upon such terms, or not, at his discretion, can not be deemed evidence of a fraudulent intent. The discretion with which he is clothed, places the whole subject within the control of the court. He is, substantially, one of its officers, constantly under its supervision, and subject to its authority. He may be restrained by its process, and governed by its decrees. He may be removed for misconduct, and a new trustee substituted in his place, (*Story's Eq. Jur.* §§ 1287, 1288, 1289;) or the court may take under its own control, the trust estate, and, by its own decree, apply it to the uses of the deed. If the trustee has disposed of the property upon terms which the law will not approve, before the court can interpose, he may be made personally liable for its value, as was done in *Meacham* v. *Sternes*, (9 *Paige*, 398.) An absolute, inflexible rule, that a trustee for

Burdick *v.* Post.

the payment of debts, must at all times, and under all circumstances, sell for cash, would be dangerous, if not destructive to the rights of creditors. Under its operation, a conscientious man could not, always, save the property from depreciation and sacrifice; while, to men of a different character, it would afford an apology, and justification for the most flagrant abuses. The exercise of a fair and reasonable discretion, in regard to the terms of the sale—whether it shall be for cash, or upon credit— is precisely what a prudent and just man would do, in the administration of his own affairs, and what the law authorizes in many instances. Such a measure of discretion, is conservative in its character, and not in hostility to the rights of the creditors. Credit, to an extent, more or less, enters into most of the business transactions of men; and unless trustees and others, acting in a fiduciary capacity, conform to the universal law, they will not, at all times, be able to realize the fair value of their property. In the country, where the estates of insolvents and deceased persons consist mostly in lands, a sale for cash, would be a sale at a sacrifice. From thirty to fifty per cent of the purchase money, in cash, with a bond and mortgage—which is readily convertible into money—are the only sure terms of bringing the property up to its real value. The practice—almost universal—of those who sell the property of others, in the execution of private or public trusts, furnishes some guide in determining what should be deemed a fraudulent act, and evidence of a fraudulent intent. Executors and administrators are trustees for the payment of debts, in the first instance; and their sales of the personal estates of their testators, or intestates, are usually upon a credit of three, six or nine months. If the personal estate proves insufficient to pay the debts, and authority is given to sell the real estate, under a surrogate's order, they are authorized by the 28th section of the act providing for such sales, (2 *R. S.* 43,) " to give such length of credit, not exceeding three years, for not more than three-fourths of the purchase money, as shall seem best calculated to produce the highest price," securing such moneys by a bond and mortgage upon the premises sold. A like au-

thority is given in regard to the execution of the class of trusts arising out of the estates of non-resident, absconding, insolvent and imprisoned debtors. The 5th subdivision of § 7, of the article which defines the powers, duties and obligations of the trustees and assignees, under title 1, chapter 5, part 2 of the revised statutes, directs them " to allow such credit on the sale of real property by them, as they shall deem reasonable, not exceeding eighteen months for not more than three-fourths of the purchase money ; which credit shall be secured by a bond of the purchaser and a mortgage on the property sold." Before the act of the 12th of April, 1820, sales of real property, upon execution, were peremptory, and the title passed to the purchaser at the time of the sale. Since that act took effect, the law has secured to the judgment debtor, and his heirs, and grantees, and to other judgment creditors, the right to redeem. So that for more than thirty years, these sales have been substantially upon a credit of twelve or fifteen months, according as either of those classes chose to become the purchasers. In regard to sales by masters, receivers and referees, some degree of credit has usually been given between the time of the sale and the time of the delivery of the deeds, in order to afford the purchaser time to procure the money and perfect the sale.

The authority for the rule that a discretion given to a trustee, under an assignment to pay debts, to sell for cash or upon credit, as he may deem most beneficial to the creditors, is evidence of a fraudulent intent, is said to be the opinion of Mr. Justice Bronson, in the case of *Barney* v. *Griffin*, (2 *Comst.* 365.) It is not claimed that such was the judgment of the court, for the reporter's note leads to a different conclusion, and the case disclosed sufficient to avoid the deed, without the aid of that question. One of the trusts of the deed from Jackson to Griffin, Wetmore and Havens, was, in all respects, similar to that which is supposed to vitiate the instrument under consideration; for it authorized the assignees " to sell the real estate, or so much thereof as should be necessary to satisfy the trusts therein declared, at public or private sale, for cash or upon credit, or partly for cash and partly upon credit, and generally

upon such terms as the assignees shall think most advanta-geous." The learned judge regards the trust as a contrivance of the debtor, which, "under color of providing for creditors, places his property beyond their reach in the hands of trustees of his own selection, and takes away their right to have the property converted into money for their benefit without delay." Every assignment by a debtor in failing circumstances, of his estate for the payment of debts, does to some extent, place it beyond the reach of the creditors, and impair their right to have it converted into money without delay. It is not, however, against the right to make the assignment and transfer the property, that the argument is aimed. It is the authority to sell upon credit, which is supposed to place the property beyond the reach of the creditors, and renders the whole transaction obnoxious to the charge of fraudulent intent. No authority is quoted in support of this position, but the case of *Meacham* v. *Sternes*, (9 *Paige*, 398,) where it is supposed the same point was considered by the chancellor. There the assigned property consisted of a stock of merchandise, debts, &c.; and the trustee was to sell at such reasonable times, and in such manner as should seem proper. He sent some part of the goods to Norfolk, to Philadelphia, and to various other parts of the United States, where they were sold at retail, upon credit, without security; and after neglect-ing, for more than six years, to attend to the collection of the purchase money, it was lost. The question was not one of fraud-ulent intent, to be inferred from the trusts of the deed, but whether the trustee was not personally liable for the value of the property, upon a bill filed for an account and distribution of the estate. The chancellor does indeed say, what no one will venture to deny, that "the assignment itself would have been clearly fraudulent, if the assignors had, in terms, directed their assignee to dispose of the property in the manner in which it was disposed of," that is, at retail, in three or more different states, upon a credit, and without security. And this is all he says, having any relation to the present question. If I am right in the position that a discretionary power, given in express words to a trustee, to sell upon such terms, for cash or upon credit, as

may be deemed most beneficial to the creditors, adds nothing, and takes away nothing from the authority given him by the law, over the subject of trust, it is decisive of the whole question; for it is conceded that no valid exception could have been taken to the deed, had it been silent in regard to the terms of the sale. The argument against the validity of the deed, derives no additional strength from the suggestion that the trustee may abuse the trust, that he may sell upon such unusual length of credit as to unreasonably delay, if not defeat the creditors altogether. This argument, if successful, would defeat every assignment for the payment of debts; for the absence of authority to sell on credit, is no security against the misconduct of the assignee.

The right of the creditor to have the property of his debtor applied without delay to the payment of his debt, exists only in theory; for the courts of justice furnish no means by which the law of immediate application can be enforced. He can not sell and obtain the title and possession of the real estate of his debtor, short of seventeen months and a half from the time he obtain his judgment. In the most numerous class of trusts known to the law—those which arise out of the estates of deceased persons—the ordinary and usual remedies are suspended for an equal period of time, to enable the executor or administrator to ascertain who are the creditors, and to convert the estate into money. A trustee under a deed of assignment for the payment of debts, may sell the estate upon reasonable terms of credit, and still be in a situation to close the trust within the time given to an executor to close the estate of his testator. Acts justifiable and commendable in a person who administers upon the estate of a deceased debtor, for the benefit of creditors, can not be fraudulent and immoral, when he administers upon the estate of a living debtor, for the same purpose.

I am of opinion that the judgment given at the special term should be reversed, with costs to the defendants.

Judgment affirmed.

[Kings General Term, October 6, 1851. Morse, Barculo and Brown, Justices.]