THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v. ERASTUS WIMAN, Appellant.

*Partners as to others only — criminal intent of an alleged forger to defraud — evidence required — what does not amount to the crime of forgery.*

Whether or not persons associated together in business were partners between themselves, depends largely upon their intent. Such persons may have been partners as to others, and yet no such relation may have existed between them.
The facts and circumstances considered, under which, on the trial of a person under an indictment of forgery, a question is presented for the determination by a jury as to whether the prohibition contained in certain articles of association had not been so far departed from, and so habitually transgressed to the knowl-

edge of the party claiming to have been defrauded, that the act of the defendant, in drawing a check to the order of a third person, signing the name of the association thereto, and indorsing thereon without authority the payee's name, and depositing the check to his own credit for the purpose of transferring a portion of the funds of the association to his own private account, was insufficient to establish a criminal intent to defraud.

Where under such a state of facts the court charges that all questions as to whether the indorsement was made with intent to defraud the payee, or to defraud the bank in which the check was deposited, were excluded from the consideration of the jury, and the only fraud which it was claimed that the defendant had attempted to perpetrate, was against the firm of which he was a member, the defendant is entitled to an acquittal, unless the unauthorized indorsement of the check was made with the intent and for the purpose of defrauding the firm.

The withdrawal of cash by a member of a firm from its assets for his own purposes does not constitute a criminal offense.

If a person is not a member of a firm, but is authorized to draw the firm checks, an abuse of that authority, even though otherwise criminal, would not of itself constitute the crime of forgery. It might be a fraud upon the firm, but such fraud would not of itself create the crime of forgery.

The intent to defraud which is spoken of by the statute, must have some relation to the act which is claimed to constitute the forgery; and where an alleged forgery is committed, not for the purpose of defrauding by means thereof, but for the mere purpose of concealing the misappropriation of money, it does not constitute that crime.

In order to constitute a crime the doing of the act prohibited with the intent to do the act is sufficient, although the party may not be aware of the fact that he is transgressing the law, but there is no possibility of an act of fraud being committed without a fraudulent intent.

The word "fraud" imports guilty knowledge, and an intent to defraud involves some moral turpitude. The taking of the money of another knowingly and wrongfully is to defraud, and the act is not qualified by the intent to return.

If, upon a criminal trial, it is competent upon the part of the prosecution to prove the indebtedness of an alleged forger as bearing on the question of his intent, the defense has the right to prove the means which he had to meet such indebtedness in order that any inference which might be drawn from such indebtedness may be rebutted.

The intent with which a person indorsed another's name to a check payable to such other, is an essential ingredient of the crime of forgery, and the presence or absence of such intent is a question of fact and not of law. Per O'BRIEN, J.

FOLLETT, J., dissenting.

APPEAL by the defendant, Erastus Wiman, from a judgment of the Supreme Court in favor of the plaintiff, rendered on the 20th day of June, 1894, at the New York Oyer and Terminer, upon the

verdict of a jury convicting him of the crime of forgery in the second degree, and also from an order made on the 20th day of June, 1894, denying the defendant's motion for a new trial.

*B. F. Tracy,* for the appellant.

*John R. Fellows, District Attorney,* and *John D. Lindsay,* for the respondent.

VAN BRUNT, P. J.:

In the disposition of this appeal it does not seem necessary to discuss all the interesting questions which have been presented by the counsel in their arguments. There is substantially no conflict of evidence; and the questions which arise thereon relate to the inferences which necessarily must be or which may be drawn therefrom.

It appears that for some time prior to the 1st of January, 1889, one Robert G. Dun, the defendant, and others, had been engaged in the business of carrying on a mercantile agency; the principal place of business being the city of New York. On said last-mentioned day the said Dun, the defendant, and one Arthur J. King and Robert D. Douglass entered into an agreement whereby they agreed to associate themselves in the business of carrying on a mercantile agency for the period of five years then next ensuing. Such agreement recited that the said Dun was the proprietor and the sole owner of the business known as the Mercantile Agency, which had been for many years, and still was, conducted under the name of R. G. Dun & Co., and Dun, Wiman & Co., in various cities in the United States and elsewhere, and of all the chattels, plant, fixtures, records and other property used in said business, as well as the goodwill thereof and of said firm names.

This agreement provided that Dun should contribute to the business the property above mentioned and described, but that said property should remain his sole and undivided property, and neither the association nor any other member of it had, nor by said agreement should acquire, any right, title or interest therein; that Wiman, King and Douglass should devote their whole time and attention and labor to the work of promoting, enlarging, carrying on and making profitable the said business; that for their services Dun should pay to them and to each of them as follows: To Wiman a sum equal to

seventeen per cent of the net profits of the business; to King a sum equal to six per cent of said net profits, and to Douglass a sum equal to five per cent of the net profits, Dun agreeing that the sums to be paid for such services in any one year should not be less than $10,000 to Wiman, $5,000 to King, and $5,000 to Douglass.

The agreement further recited that the association was formed for the purpose of encouraging and stimulating in the said Wiman, King and Douglass a jealous pride and ambition in the character and repute of the said business, as well as to induce their extraordinary exertions in building up and extending the business and increasing its profits; and that to that end the articles provided that their compensation should be (to some extent) contingent upon the profits of the business, but as to them the amount of the profits only afforded the basis of determining the amount of their salaries, and that neither of them had any right, title or interest in or to the said profits as such.

Then followed provisions as to how the term "net profits" should be construed, and how they were to be ascertained; also, a provision for the termination of the association at the will of any party thereto by his giving oral or written notice to any other party thereto of his election to terminate, and that the association should be terminated by the death of Wiman, King or Douglass.

The agreement further provided that upon the termination of the association Dun should have the sole and exclusive right to the possession and control of all the property of said agency, and of the records and books of account thereof, and to the liquidation, adjustment and settlement of the affairs thereof.

Then followed provisions relating to the event of the death of Dun pending the term of the association, and that the business during the term of the association should be carried on under the name or style of R. G. Dun & Co.

By the seventeenth article of said agreement it was further provided: "That no party to this agreement shall at any time use or employ the said name of R. G. Dun & Co., or any name under which said business shall be carried on, for any purpose except the regular and proper business of the said mercantile agency, and that neither the said Wiman, King or Douglass shall use the said name in making, signing, drawing or indorsing any note, bill of exchange,

draft or other obligation or evidence of debt, excepting only indorsements of such papers for the purpose of depositing the same to the credit of the said association or of collecting the same for the account of the association."

By the eighteenth clause it was provided : " That neither the said Wiman, King or Douglass shall, in his own name, sign or indorse any note, negotiable instrument, obligation, undertaking or evidence of debt, as security, either in form or in fact, without the written consent of said Robert G. Dun."

By the twenty-second article of the agreement Wiman was permitted to draw each month $3,000, King $1,000 and Douglass $1,000, from the cashier of the agency.

From the time of the entering into this agreement in January, 1889, as had been done for many years previous, business as a commercial agency in the name of R. G. Dun & Co. in the United States, and Dun, Wiman & Co. in Canada, was carried on. The general affairs and business of the concern were under the defendant's charge and control subject to Dun's directions, except the department relating to New York city, which was in charge of King, and the other agencies in this State, which were in charge of Douglass. In the conduct of the financial affairs of the association more than three-quarters of all the checks issued by the concern in the course of its business were signed by the defendant in the firm name of R. G. Dun & Co., the others being signed principally by Douglass, one of the other members of the association, Dun taking but little apparent interest in the business and being absent more than half of the time.

It seems to be admitted by the learned counsel for the defendant that under the prohibition contained in the seventeenth article of the agreement, none of the associates other than Dun would have had the right to sign any checks. But an examination of this clause seems to us to lead to a different conclusion, and that it was never intended to deprive the members of the association of the right to sign the checks of the concern, and that when bills of exchange, drafts or other obligations or evidences of debt were referred to, it was not thereby intended to include the checks which were necessary to be signed and issued in the ordinary transaction of the business, but that such provision had reference to the other classes

of mercantile paper which would come under the definition of bills of exchange, drafts or other obligations or evidences of debt. In fact the practice under the agreement showed that it was not so construed by any of the parties thereto, inasmuch as checks were uniformly and almost exclusively signed by others than Dun. Therefore, in the consideration of the relation of these parties to each other, we must assume that there was no intention to restrict the rights of these associates in respect to the drawing of checks in the ordinary course of the business of the agency. It seems to have been assumed that by reason of the association of these parties together, they would have the right to use the firm name in respect to the business of the association generally; and in order to restrict this right it was considered necessary to insert the prohibition contained in the articles of association.

The management of this business, as has already been stated, except in respect to the city of New York and the agencies in the State of New York, was in the hands of Wiman, and Wiman, Douglass and King substantially managed the whole business of the association, with little interference upon the part of Dun. For several years prior to the 6th of February, 1893, the defendant had been largely overdrawn in his accounts with the association, to the knowledge of Dun. Upon that day the defendant, desiring an additional sum of $5,000 for his own purposes, directed the cashier of the concern to draw a check for $5,000 to the order of one E. W. Bullinger, to whom the concern was then indebted in a sum of at least $15,000, telling the cashier at the time that Bullinger wished a check on account. The cashier filled up the check according to the defendant's direction, and delivered it to him unsigned. Upon receiving the check the defendant signed it "R. G. Dun & Co." as he had the right to do, and then indorsed thereon the name of Bullinger, and, indorsing it in his own name, deposited the check to his own credit in the Central National Bank, and used the money for his own purposes. Bullinger had made no demand on R. G. Dun & Co. or the defendant for $5,000 on the sixth of February, and he never saw the check until the 17th or 18th of February, 1893, and never authorized the defendant to sign his name on the back of that or any other check, or in any way upon a piece of commercial paper.

The defendant was subsequently indicted for forging the name of Bullinger upon the back of this check with intent to defraud, and also for uttering the same with like intent. Upon the trial the defendant was convicted of forgery in the second degree, and from the judgment thereupon entered this appeal is taken.

Various questions are presented for our consideration, amongst which is the question as to the relation which Dun, Wiman, Douglass and King bore to each other in respect to this business. It was held upon the trial that the associates were not partners, but that Wiman, Douglass and King were substantially employees upon a salary.

As between the parties the question as to what relationship has been created by association depends largely upon intent. We think it would not be disputed for a moment but that the parties to this agreement became partners as to third persons. But it is contended upon the part of the prosecution that no such relation existed as between themselves. As already suggested, the solution of this question depends largely upon the intent of the parties entering into this agreement and association; and while it may not be possible to dispose of this question in the affirmative as a matter of law, yet there seems to have been amply sufficient evidence to go to the jury thereon. These parties were associated together in a common enterprise. The written agreement seems to have been intended to prevent . Wiman, King and Douglass from having any interest in the plant of the business which belonged to Dun, and the business generally was to be subject to the control of Dun in so far as he desired to act contrary to the wishes of his associates; but in all other respects the associates of Dun were to have the right to conduct the business, and they did conduct it with but little interference or supervision upon the part of Dun. For the protection of his capital, Dun placed certain restrictions upon the rights of his associates, which he conceived that they undoubtedly would have had in the absence of such restriction. Hence, the article in regard to commercial paper, etc. But it was nowhere believed necessary to confer by this instrument any authority upon Dun's associates to do anything in connection with the business. The scope of the agreement is almost entirely prohibitory and does not attempt to confer any authority or rights except in so far as it may define the extent

of the interest which the associates were to have in the association. It was assumed by all these associates that, as a result of the association, as matter of law Wiman, Douglass and King, as well as Dun, could sign the firm name except where prohibited by the articles of agreement. If they were not co-partners, if it was not the intention that they should be co-partners, where did the associates of Dun get this authority? It cannot be found in the agreement, yet it was taken as a matter of course.

It is further to be observed that the association might be terminated at any instant at the will of any party thereto by his giving oral or written notice to any other party thereto of his election to terminate it. Hence, if Wiman, King and Douglass were mere employees of Dun, one employee, by giving notice to another employee, had the power to terminate the employment of all — a fact inconsistent with the idea of mere employment.

It seems to us upon a consideration of these facts that at least the jury would have been justified in finding that it was the intention of these associates that they should be partners in this adventure, and have all the rights of partners except in so far as they were restricted by the terms of their agreement of association. If the jury so found, then Wiman, Douglass and King were equally with Dun liable for the expenses of the business, which amounted to $2,500,000 per year, and they were entitled to have the receipts of the business applied to the payment of these obligations, it was error, therefore, to rule as the court did, that it was clear that Dun was the owner of the receipts of the business, and thus deny all rights of his associates in such receipts.

The court was requested to charge as follows: That "in determining the power and authority of Wiman in respect to the business of the firm, the jury is not bound to consider the written articles of co-partnership alone, but may also consider the manner in which the parties actually conducted the business of the firm; and where the letter of the articles was knowingly and intentionally departed from by the parties, the practice and custom of the parties, rather than the letter of the articles, shall control."

In answer, the court said: "Subject to what I stated to you, gentlemen, I so charge — subject to my general charge."

The general charge of the court had been, that under the contract

and the letter hereinafter referred to, received by the defendant, he had no right to take from the assets of the firm to his own use more than $3,000 a month.

The court also stated to the jury that the question for them to decide was: " Did he write the name of Bullinger on the back of that check with intent to get this money from the firm that he had no right to take and apply it to his own purposes? In other words, did he write the name of Bullinger upon the back of that check with the intent to defraud Mr. Dun or his partners ? "

The evidence in this case showed that to the knowledge of Dun, Wiman had been in the habit of overdrawing his account for several years. Dun would protest, Wiman would repent, and, to Dun's knowledge, repeat the offense immediately thereafter. On the 12th of January, 1893, Dun wrote to Wiman protesting against his over-drafts; Wiman replied, admitting the charge, explaining the reasons why it had occurred, and promising not to increase the amount. And shortly thereafter he drew the check and made the indorsement in question, in accordance with his usual habit. It would seem, under these circumstances, that it was a question for the jury to determine as to whether the prohibitions of the articles of association had not been so far departed from and so habitually transgressed, to the knowledge of the parties now claiming to have been defrauded, that upon the act of the defendant in drawing the check in question for the purpose of transferring a portion of the funds of the firm to his own private account, a criminal intent to defraud could not be predicated.

The further question presented is as to whether an intent upon the part of the defendant to defraud his co-partners would be sufficient to justify a conviction of forgery under this indictment. By the charge of the court all questions as to whether the indorsement was made with intent to defraud Bullinger, or to defraud the bank in which Wiman deposited the check, were excluded from the consideration of the jury. The only fraud which it was claimed the defendant had attempted to perpetrate was upon the firm of R. G. Dun & Co. Unless, therefore, the unauthorized indorsement of the check was made with the intent and for the purpose of defrauding the firm the defendant was entitled to an acquittal. If Wiman was a member of this firm the withdrawal of these funds

from the assets of the firm for his own purposes would not consti-tute a criminal offense. Even if he was not a member of the firm he was authorized to draw the firm checks, "and an abuse of that authority, even if otherwise criminal, could not constitute forgery. It might well be a fraud upon the firm, but such fraud would not of itself create the crime of forgery."

If Wiman was a member of the firm the misappropriation of the funds of the firm to his own use would not subject him to criminal process; and even if not a member of the firm, he having authority to draw the check in question, the crime alleged relating solely to the indorsement, the criminal intent must apply not only to the drawing of the check but to the unauthorized indorsement. The evidence in this case shows that the intent to defraud, if any existed, related entirely to the drawing of the check, and that the unauthor-ized indorsement was resorted to for the purpose of concealing the overdraft. It is conceded that there was no intention upon the defendant's part to defraud Bullinger, nor is it claimed that he believed that Bullinger could incur any liability because of such indorsement, as the defendant well knew and as the court charged the jury he believed, that the check would be paid on presentation at the bank upon which it was drawn, the firm having ample funds to meet the same. It would seem that the intent to defraud, which is spoken of by the statute, must have some relation to the act which is claimed to constitute the forgery; and where the alleged forgery is committed, not for the purpose of defrauding by means thereof, but for the mere purpose of canceling the misappropriation of money, it does not constitute the crime. This principle is recog-nized by Wharton (§ 1144), where he says that in forgery it is not necessary to have in mind an intent to defraud a particular person if the consequences of the act would necessarily or might possibly be to defraud any person. But there must at all events be a possibility of some person *being defrauded by the forgery.* There was no possibility of Dun & Co. being defrauded by the alleged forgery in this case.

That it was necessary that this intent to defraud in reference to the matter of indorsement should be present seems to have been recognized by the court when it instructed the jury at the end of its

charge that if they found that Wiman believed that under the rules of law applicable to commercial paper he had legal authority to use the name of a person as payee to whom it was not intended that the check should be paid and to indorse such name on the back of the check, such indorsement is not forgery.

The court, however, during the progress of the summing up of the counsel for the defendant, declined to permit him to discuss the facts and circumstances upon which this proposition is predicated. The court interrupted the counsel for the defendant in his summing up and the counsel stated that his summing up related to this proposition, which he would request the court to charge as follows: "I shall ask your honor to charge the jury that if the defendant believed that under the rules of commercial law he had legal authority to make this check and indorse it as he did, the crime is not forgery."

The court answered: "That I shall refuse."

The counsel for the defendant excepted and then proceeded with his summing up, abandoning his argument upon that point. As has been seen, the court, at the close of the charge, presented the proposition to the jury, and no opportunity was offered for the counsel to address the jury in respect to the point in the discussion of which he was interrupted. Nor was there any retraction by the judge of what he had said during the summing up. There were thus two inconsistent propositions before the jury, and it is impossible to determine by what rule they were guided in the consideration of the case.

The court also seems to have entirely taken from the jury the question of criminal intent. The defendant requested the court to charge as follows: "Unless the jury find that the acts charged were committed with criminal intent the defendant is entitled to an acquittal."

In answer to this request the court said to the jury: "I charge you unless the act was committed with intent to defraud, as I explained it to you, the defendant is entitled to an acquittal; I refuse to charge as requested."

During the charge the court charged the jury in respect to the meaning of the word "defraud" as follows: "Defraud has been defined as follows: 'To deprive of right either by obtaining some-

thing by deception or artifice, or by taking something wrongfully without the knowledge or consent of the owner,' and I think that is as good a definition of 'defraud' as I know of."

It will be at once seen that this definition is fatally defective so far as it relates to criminal proceedings, as the last branch of the proposition takes no cognizance whatever of the question of intent. The jury were by this definition in effect charged that if Wiman wrongfully took without the knowledge or consent of Dun the money in question, although he may have believed that he had the right to take the money, he was guilty of the intent to defraud required by the statute, thus, as has been intimated, eliminating the one element which it has been repeatedly held must be present, namely, the criminal intent.

It is undoubtedly true that in order to constitute a crime, the doing of the act prohibited with the intent to do the act is sufficient, although the party may not be aware of the fact that he is transgressing the law. But there is no possibility of an act of fraud being committed without a fraudulent intent. The word "fraud" imports guilty knowledge. A man supposing that he has a right to property and taking it without the knowledge or consent of the owner, would, under this definition, be held to be defrauding the owner if it should subsequently turn out that his supposed right was without foundation. In order that there should be no mistake upon this point, the court subsequent to the giving of this definition expressly charged the jury that the question for them to determine was : "Did he write the name of Bullinger on the back of that check with intent to get this money from the firm that he had no right to take and apply it to his own purposes ?" No question of criminal intent was submitted, the only question of intent submitted being an intent to do an act which was not by any means of necessity criminal. Even if Wiman believed he had the right to take this money because of the course of previous dealings, the jury were instructed that if he took it intending to take it, he was guilty of an intent to defraud. An intent to defraud would seem to involve some moral turpitude, but under this instruction a mistake as to property rights is, of itself, sufficient to justify a finding of fraud. This is carrying the definition of "fraud" much further than has yet been done. We think that in thus instructing the

jury the question of criminal intent was entirely eliminated, and under these circumstances the refusal of the request to charge was error.

There would seem also to have been error either in the admission or the exclusion of testimony. The prosecution was permitted to prove the overdrafts of Wiman and his want of funds in the bank to meet the same upon the theory that this evidence was competent upon the question of the intent to defraud Dun and his associates by the drawing of the check in question. But when the defendant attempted to establish his pecuniary condition by showing the value of the property which he owned, that evidence was excluded. And it seems to us, certainly, that if it was competent upon the part of the prosecution to prove the indebtedness of Wiman as bearing on the question of his intent, he had the right to prove the means which he had to meet such indebtedness, in order that he might rebut any inference which might be drawn from such indebtedness.

It is not intended to countenance for a moment by this suggestion the theory that if Wiman was guilty of a forgery in the obtaining of this money, the fact that he intended, or hoped, or expected to return it in any way qualified the nature of his act. It would certainly be an anomaly in the law that an intent to make reparation and the ability to do so would make acts innocent which otherwise would be criminal. The taking of the money of another knowingly wrongfully is to defraud, and the act is not qualified by the intent to return. The thief cannot be heard to say : " It is true I stole the money to-day, but I intended to return it to-morrow, and, therefore, I am innocent."

Nevertheless, as already stated, if it was competent for the prosecution for the purpose of showing intent to prove partially the financial condition of Wiman, he had a right to prove the balance.

The judgment should be reversed and a new trial ordered.

O'BRIEN, J. :

It is conceded that the defendant had the right to sign checks in the name of R. G. Dun & Co. Whether such right was conferred upon him by express or implied authority, or by virtue of his status as a partner in the firm, seems to me immaterial so far as it affects the

crime with which the defendant stands charged.   He was not called upon to answer for having made the check, but for having, with intent to defraud, indorsed the name of Bullinger upon the back thereof.   If, therefore, he had made the check to Bullinger's order, having originally intended to deliver it to him, and, subsequently, having changed his mind, he indorsed the check with intent to defraud, he would be as guilty of the crime of forgery as though he had made the check with the original intention of having it payable to the order of Bullinger, without intending to deliver it to him, but to indorse the latter's name thereon, and thus fraudulently obtain the money represented by the check.   In other words, by the act of indorsing the name of Bullinger with criminal intent he would be guilty of forgery, whether he had or had not been guilty of any independent or separate fraud in signing the check.   The evidence shows beyond dispute that without authority he indorsed the name of Bullinger thereon ; and whether he was guilty or not of an independent fraud in signing the check could not lessen his guilt, if established, of having with intent to defraud, forged the name of Bullinger.   The intent with which the act was done was an essential ingredient of the crime, and being a question of fact and not of law it was necessary that under proper instructions it should be submitted to the jury, to whom the solution of the question of fact belonged.   It was important to the rights of the defendant that this question should be clearly presented to the jury, and where, as in the case at bar, this was not done, it cannot be regarded as a harmless error.

I concur, therefore, in the result reached by the presiding justice, that the judgment of conviction should be reversed, and the defendant have a new trial.

FOLLETT, J. (dissenting) :

February 21, 1894, the defendant was charged by an indictment with having committed, February 6, 1893, the crime of forgery in the second degree — by the first count with having feloniously forged, with intent to defraud, the signature of the payee, and by the second count with having feloniously uttered, with intent to defraud, the forged signature of the payee of the check, of which the following is a copy :

" No. 57783.                        The Mercantile Agency,
                                      " R. G. Dun & Co.
                                  " New York, *Feby.* 6, 1893.
    " $5,000            Chemical National Bank,
" Pay to the order of E. W. Bullinger,
    " Five Thousand ............................... Dollars.
    " $5,000.                        R. G. DUN & CO."

In June, 1894, a trial was had which resulted in a verdict of guilty, and June 20, 1894, the defendant was sentenced to imprisonment in a State prison for five years and six months. The following are the provisions of the Penal Code under which it is urged that the defendant's act was a crime:

" Section 511. A person is guilty of forgery in the second degree who, with intent to defraud ;   *   *   *.

" 2. Forges   *   *   *   an instrument or writing, being or purporting to be the act of another, by which a pecuniary demand or obligation is or purports to be or to have been created, increased, discharged, or diminished, or in any manner affected, or by which any rights or property whatever are or purport to be or to have been created, transferred, conveyed, discharged, increased, or diminished, or in any manner affected, the punishment for forging, altering, or counterfeiting, which is not hereinbefore prescribed, by which false making, forging, altering, or counterfeiting, any person may be bound, affected, or in anyway injured in his person or property."

" Section 521. A person who, knowing the same to be forged or altered, and with intent to defraud, utters, offers, disposes of, or puts off as true, or has in his possession, with intent so to utter, offer, dispose of, or put off, either,   *   *   *

" 3. A forged will, deed, certificate, indorsement, record, instrument or writing, or other thing, the false making, forging, or offering of which is punishable as forgery ;

" Is guilty of forgery in the same degree as if he had forged the same."

It was proved by undisputed evidence that the check was filled out by the direction of the defendant, that he signed it on the day of its date, and on the same day indorsed thereon, without authority, the name of the payee and deposited the check so indorsed with the

Central National Bank, which, February 6, 1893, gave him credit therefor, and that February 7, 1893, the check was paid to said bank by the drawee and charged to the account of R. G. Dun & Co. The defendant was sworn on the trial and he testified that Edward W. Bullinger, the payee, gave him no permission to indorse his name on that or on any other check, and that he did not notify Mr. Bullinger that he had made the indorsement. He further testified that Mr. Bullinger was a creditor of the firm of R. G. Dun & Co. for more than $15,000, and that he drew and indorsed the check in that form to transfer the funds of R. G. Dun & Co. to his own account and conceal the transaction. On Friday, February 17, 1893, the existence of the check was discovered by Robert D. Douglass, one of the members of R. G. Dun & Co., and on the next day the fact that the discovery had been made became known to the defendant, who, on Monday, February twentieth, wrote and mailed this letter, which was received by Robert G. Dun, to whom it was addressed:

"314 BROADWAY, NEW YORK,

"*February* 20, 1893.

"My Dear Mr. DUN:

"I have had occasion to write you more than once in terms of great humiliation, but never before under such circumstances as now, in which I have a confession to make to you. It is, that *improperly and fraudulently I have signed the name of Mr. E. W. Bullinger on the back of two checks of your firm made to his order.* I will not urge that this was done without any evil intent or that he would not have signed them himself had I asked him, or that I had any intention of defrauding you or him. Simply and frankly I must say that I committed this act without authority and most imprudently, and can ask no excuse nor palliation of the offense except such as in your abundant charity and goodness of heart you may in mercy extend to me.

"For the sake of my dear wife and children, and for the sake of the long service rendered to you, I pray God your heart may still be softened toward me and that I may not be made to suffer the penalty of my offense.

"(Signed)                Respectfully,

"ERASTUS WIMAN."

January 7, 1893, the defendant had drawn a check to the order of E. W. Bullinger for $5,000 on the Chemical Bank and signed it R. G. Dun & Co., and had indorsed thereon the name of E. W. Bullinger, and applied the avails to his own use. The foregoing letter refers to this check and to the one set out in the indictment.

Before discussing the particular questions raised on this appeal it will be well to state the rules of law relating to the crime of which the defendant was convicted. By the common law forgery was classed with offenses known as cheats, and if an instrument or document was falsely made, altered or uttered with intent to defraud, though no one was actually cheated or defrauded, the crime of forgery was committed. (1 Bish. Cr. L. [6th ed.] § 572; 2 id. §§ 521, 597; 2 East P. C. 854; Steph. Dig. Cr. L., arts. 355, 356; 3 Coke Inst. 168.) The ingredients of the offense are the same under the Penal Code of this State.

"§ 509. A person is guilty of forgery in the first degree who, *with intent to defraud*, forges" certain specified documents.

"§ 511. A person is guilty of forgery in the second degree who, *with intent to defraud*, forges" certain specified instruments.

The ingredients of the offense are (1) counterfeiting certain specified instruments (2) with intent to defraud. That the defendant drew the check, and, without the authority of Bullinger, indorsed his name thereon, is confessed. This was counterfeiting. The only other ingredient necessary to be established to prove the commission of the crime of forgery was to show that the signature was made with intent to defraud. The statute does not require that the counterfeiting be done with intent to defraud a particular person, but if it was done with the intent to defraud any one it is sufficient. Neither the common law nor the statute requires that the counterfeiting be done with intent to perpetrate a criminal fraud for the commission of which the perpetrator could be indicted, but if the fraud intended be a commercial one by which another is defrauded or intended to be defrauded by imposing an apparent liability or by depriving him of some right or property, it is sufficient. An intent to commit an independent fraud is not in all cases a necessary ingredient of the crime of forgery. In case A has a credit with a solvent bank for $1,000 and draws his check thereon for $100 to the order of B, indorses his name thereon knowing that

he has no authority, and negotiates the check at another bank, he is guilty of forgery. It is a fraud on B to assume to impose a possible liability on him, and it is also a fraud on the bank taking the check. In such a case it is not necessary to show that A intended to defraud B, the bank taking the check, or any subsequent holder, of the amount of the check, and it would be no defense to show that A believed the check would be paid or to show that it was paid. The drawer and drawee might both fail and B be put to his defense. The act supposed is a fraud in and of itself. But if A, instead of negotiating the check, had personally presented it to the bank on which it was drawn and received the money thereon, it would be necessary to show that he intended to commit some independent ulterior fraud. If it could be shown that he made, indorsed and procured the check to be paid to himself, on which B's signature was counterfeited, with intent to use it as evidence of the payment of his debt of $100 to B, the act would be forgery within section 521 of the Penal Code.

The question whether the defendant made, indorsed and negotiated this check, with intent to defraud E. W. Bullinger or the Central National Bank, was not submitted to the jury, but was expressly withdrawn by the learned judge — we think erroneously — from their consideration.

The case was submitted to the jury on the theory that it was necessary to show that the defendant made the check and counterfeited the indorsement of E. W. Bullinger, with intent to defraud R. G. Dun & Co., on which theory this judgment must stand or fall. This brings us to the question whether any substantial error was committed in submitting this issue, or in the reception or rejection of evidence bearing on it.

It was urged on the trial, and it is urged in this court, that the defendant was a partner of R. G. Dun & Co., and, being such, that his secret withdrawal of the partnership funds for his individual use was neither a fraud nor a crime. We think the issues, whether under the contract the defendant was a partner, or whether he believed himself to be one, were not material. Partners occupy fiduciary relations towards each other, and if one partner misappropriates the funds or property of the firm he commits a fraud on his co-partners. In case one member of a firm secretly withdraws the firm assets and converts them to his own use without the consent of

his partners he commits a commercial fraud. It certainly will not be contended that it is impossible for one partner to defraud his co-partners or the firm of which he is a member. The evidence given by the defendant conclusively shows that he had no right to use the partnership funds for his own purposes, and that he knew it. It was not shown that the other members of R. G. Dun & Co. had assented to such use, but, on the contrary, frequent and sharp letters of reproval were written the defendant criticising him for having so used the funds and forbidding such use thereafter, and the defendant frequently promised, in writing, that he never would so offend again. That the defendant did apply the $5,000 received by means of this check to his individual use and attempted to conceal the fact is not denied. To do this was a fraud, and, if accomplished by means of forgery, it was a crime. It is no defense for the defendant to prove that it was within his power to have accomplished the same end by means which were not criminal. The answer is, that he chose not lawful but unlawful means to accomplish his purpose and such as are condemned as a crime. By indorsing the name of E. W. Bullinger upon the check and depositing it to his credit in the Central National Bank — not the bank upon which it was drawn — he assumed to create a liability by counterfeiting Bullinger's signature, which was a crime. As before stated, it was a crime in and of itself, and it was also a crime within the issue submitted to the jury, that issue being found in favor of the People.

The question whether the defendant drew this check and counterfeited the signature of E. W. Bullinger with intent to defraud R. G. Dun & Co. was submitted to the jury and found against the defendant upon evidence which, we think, was entirely sufficient to sustain the verdict. The defendant's letter of February 20, 1893, was sufficient, in connection with the undisputed facts and circumstances, to sustain the verdict that the act was done with intent to defraud the firm. No error was committed by the refusal of the court to advise, pursuant to section 410 of the Code of Criminal Procedure, the jury to acquit the defendant.

In this connection the court was asked to charge : " III. Unless the jury find that the acts charged were committed *with criminal intent* the defendant is entitled to an acquittal." The court refused to charge in the language of the request, and repeated : " I charge

you unless the act was committed with intent to defraud, as I explained it to you, the defendant is entitled to an acquittal. I refuse to charge as requested." To this the defendant's counsel excepted.

The court in its charge had previously defined the word "defraud" as follows: "Defraud has been defined as follows: 'To deprive of right, either by obtaining something by deception or artifice, or by taking something wrongfully without the knowledge or consent of the owner,' and I think that is as good a definition of 'defraud' as I know of. . The intent must be to deprive a person of a right, either by obtaining something by deception or artifice, or by taking something wrongfully without the knowledge or consent of the owner."

This definition was not excepted to, and is sufficiently full and accurate for the purposes of the issue submitted to the jury.

Under the sections of the Code before quoted, if the act was committed by the defendant with intent to defraud, it follows that it was done with a criminal intent, for the statute declares it to be a criminal forgery. The terms "with intent to defraud" and "with a criminal intent" are under this statute synonymous. It has been several times said by the Court of Appeals that an act in order to constitute a crime must be done with a criminal intent. But it has never been held that in case the court correctly instructed the jury as to the ingredients making up a particular crime, and that they must find that all of them existed before the defendant could be convicted, that in addition the court must charge that the act was committed with a criminal intent. The term is used for brevity. If, on the trial of an indictment for murder in the first degree, the court should charge that before the defendant could be convicted the jury must find that he killed the decedent from a deliberate and premeditated design to effect his death, it would not be error to refuse a request preferred after the charge had been delivered that the jury must find that the act was committed with a criminal intent. When, as in the case at bar, the jury is fully and correctly instructed as to all of the ingredients of the crime under consideration, and are charged that before they can convict they must find that all of the ingredients of the crime existed, it is quite sufficient.

Persons violating the criminal law of the State with the unlawful intent prescribed by the statute are guilty of a crime, even though they are ignorant that the act is criminal.

No error was committed in refusing to charge the twenty-sixth request : " If the jury believe that at the time Wiman wrote Bullinger's name on the back of the check in question he intended to use his name merely as a fictitious payee, such writing of the name of the payee on the back of the check is not forgery." E. W. Bullinger was not a fictitious payee, but a real person and a creditor of R. G. Dun & Co., and the defendant directed the cashier to draw this check, stating that Bullinger wished a check on account, and the check was charged to him.   This was testified to by the cashier and not denied by the defendant.   There was no evidence that the defendant intended to use the name of Bullinger as a fictitious payee, but the uncontradicted evidence was that he drew it to his order so as to cause it to be believed that it was applied as a payment to him.

The issue was sought to be raised, notwithstanding the defendant's letters, that he believed he was authorized by law not only to draw the check for the purpose of appropriating the funds of R. G. Dun & Co. to his own use, but was also authorized to indorse the name of E. W. Bullinger on the check.   The letters written by the defendant conclusively show that he did not believe that he had the right by means of checks to divert the funds of R. G. Dun & Co. to his individual use.   The defendant testified that he was sixty years of age, and since his youth had been constantly engaged in various large business transactions, was familiar with commercial matters and the use of checks.   The issue was not tendered that the defendant was insane, nor that he acted under an insane delusion in making and indorsing the check set out in the indictment.   The testimony of a defendant that he believed that he had the right to do an act which is a crime is entitled to no weight, unless from the nature of the act and the circumstances surrounding it a sane person might have so believed.   The act of the defendant was a single transaction, begun by directing the check to be drawn and terminated by depositing it in the Central National Bank.   It is true that the transaction was made up of several distinct steps.   So is every crime ; but in the case at bar the steps were so connected that they constituted but a single act or transaction.   It will not do to separate the several acts by which a crime is committed and hold that every one must of itself, disconnected from the others, have been unlawful.   It is true that if the defendant had drawn this

check to bearer, and so fraudulently acquired $5,000, he would not have been guilty of the crime of forgery. This he did not do, but instead made the check payable to the order of E. W. Bullinger, and without authority indorsed his name thereon with intent to defraud and so brought himself within the terms of the statute.

Upon the request of the learned counsel for the defendant the court charged:

"XXXI. If the jury shall find that Wiman believed that under the rules of law applicable to commercial paper he had legal authority to use the name of a person as payee, to whom it was not intended that the check should be paid, and to indorse such name on the back of the check, such indorsement is not forgery."

During the summing up of the counsel for the defendant he attempted to discuss the testimony which he asserted bore upon this proposition, but was interrupted by the court. Thereupon, the counsel said: "I shall ask your honor to charge the jury that if the defendant believed that, under the rules of commercial law, he had legal authority to make this check and indorse it as he did, the crime is not forgery.

"THE COURT — That, I shall refuse.

"MR. TRACY — And your honor will give me an exception now.

"THE COURT — Certainly; I will give it to you now."

It is now insisted that the ruling made during the summing up and the one made by the thirty-first request were inconsistent, and that if an error was committed in the first ruling the defendant was presumably harmed by the court's refusal to permit his counsel to discuss the question of fact bearing upon the proposition. Courts do not sit for the purpose of trying or reviewing abstract questions of law; and if they assume to determine such questions, however much they may err, it is not a reason for reversing their judgments. We think that the evidence did not present this proposition. The defendant testified that he was sixty years of age, and since his youth had been continually engaged in various and large business transactions involving the use of bank accounts and of checks. There was no testimony in the case that would have warranted the jury in finding that he believed that, for the purpose of concealing his overdraft from R. G. Dun & Co., he had legal authority to counterfeit the name of E. W. Bullinger. As before stated, it was

not alleged that the defendant was insane or acted under an insane delusion, and in the absence of such an issue the jury had no right to find that the defendant believed what a sane man would not have believed.

It is also urged that the court erred in excluding evidence as to the value of the property possessed by Wiman in February, 1893. He was permitted to describe as minutely as his counsel wished the property possessed by him, and to give his own estimate of its value. The People did not controvert the testimony of Wiman as to the quantity or value of his property. Subsequently, a witness was called by the defendant by whom it was sought to prove the value of certain property owned by the defendant. The court ruled that this evidence was entirely immaterial, and an exception was taken. No issue was raised upon this question. The defendant's evidence stood entirely uncontradicted, nor was there any subsequent effort made to contradict it by the People.

For the purpose of showing that the check of February 6, 1893, was signed, indorsed and uttered with intent to defraud R. G. Dun & Co., it was competent to show that the defendant had signed, indorsed and uttered other checks of R. G. Dun & Co., all forming a part of a system designed to effect the same end — appropriating the funds of R. G. Dun & Co. for the benefit of the defendant. Such evidence is quite different from that condemned in *People* v. *Corbin* (56 N. Y. 363). In that case the defendant was tried for forging the indorsement of Van Amburgh on a promissory note, and the defense was (1) authority to write the name on that particular note, and (2) a belief that defendant had such authority. The People were permitted to show that defendant confessed that he forged the name of Ganoung on other promissory notes, which was held to be error. Evidence of other and disconnected forgeries was not relevant to the issue whether defendant was expressly authorized to indorse the name of Van Amburgh, or to the issue whether he believed that he was so authorized.

The judgment should be affirmed.

Judgment reversed, new trial ordered.