PEOPLE v. HEGEMAN.

(Supreme Court, Trial Term, New York County.   December 2, 1907.)

1. INDICTMENT — MOTION TO QUASH — INSUFFICIENCY OF EVIDENCE BEFORE GRAND JURY.

The court has power to entertain a motion to quash an indictment for the insufficiency of the evidence before the grand jury and to grant it in a proper case.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 483.]

2. FORGERY—ELEMENTS OF OFFENSE—STATUTES.

Under Pen. Code, § 515, declaring that one who, with intent to defraud, makes a false entry in any book of accounts, is guilty of forgery, the two essentials to constitute forgery are the making of the false entries and the intent in so doing to defraud.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Forgery, § 50.]

3. CRIMINAL LAW—MOTIVE—INTENT.

A motive in a criminal case differs from an intent, and, no matter whether the motive be good or bad, if the presence of the intent required to constitute a particular unlawful act is proved, the offense, if committed, is complete.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law. §§ 21–24.]

4. FORGERY—INTENT—"DEFRAUD"—EVIDENCE.

Under Pen. Code, § 515, providing that one who, with intent to defraud, makes a false entry in a book of accounts, shall be guilty of forgery, and sections 718,·721, declaring that, where an intent to defraud is required, intent to defraud any person or association, etc., is sufficient, proof that the president of an insurance company made false entries in the company's books, with a view of excluding from the annual reports to the state insurance department all references to syndicate operations and collateral loans, is not alone evidence of an intent to defraud essential to constitute forgery; "defraud" implying the obtaining of an unconscionable advan-

tage to one party or the unjust deprivation of property or rights belonging to the other.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Forgery, § 50.

For other definitions, see Words and Phrases, vol. 2, pp. 1947–1949; vol. 8, pp. 7631, 7632.]

**5. SAME—FALSE ENTRIES IN BOOKS OF ACCOUNT.**

The making of false entries in corporate books, through mistake or with a purpose to accomplish by appropriate fictitious entries a proper bookkeeping result, or to deceive some one with no purpose of profit either contemplated or possible, is not forgery; but the making of false entries in corporate books with a view to conceal the evidence of a crime already committed or to render its detection impossible or more difficult, or to facilitate the commission of a future crime, or to defraud creditors, present or prospective, stockholders, or any other persons, is a forgery, under Pen. Code, § 515, defining forgery in the third degree as the making of false entries in books of account with intent to defraud, etc.

**6. SAME—INTENT—PROOF.**

Since intent to defraud is essential to forgery in the third degree, under Pen. Code, § 515, it must affirmatively appear that sufficient evidence to establish the intent or to justify the inference of its existence has been received by the grand jury, in order to authorize it to return an indictment.

**7. CRIMINAL LAW—INTENT—PROOF.**

Where an act becomes criminal only through the existence of a specific intent, the intent must be proved, and proof of the doing of the act is not sufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1271.]

**8. SAME.**

Where the facts are undisputed, the question whether the evidence shows a crime as charged is a question of law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1715.]

**9. INDICTMENT — MOTION TO QUASH — INSUFFICIENCY OF EVIDENCE BEFORE GRAND JURY.**

Evidence before the grand jury, on which it found indictments for perjury, *held* not so insufficient as to require that the indictments be quashed on motion.

John R. Hegeman was indicted for forgery and perjury. Indictments for forgery quashed for failure of the evidence to disclose an intent to defraud.

William Travers Jerome, Dist. Atty., and Isidor J. Kresel, Asst. Dist. Atty., for the People.

John G. Milburn, De Lancey Nicoll, R. V. Lindabury, and Morgan J. O'Brien, for defendant.

DOWLING, J. These are motions, ten in number, to quash, dismiss, and set aside a like number of indictments found by the grand jury of the county of New York against the defendant, John R. Hegeman, whereof seven are for the crime of forgery in the third degree and three are for the crime of perjury, upon the ground of the insufficiency of the evidence before the grand jury. The transactions upon which they are based, as shown by the minutes of the grand jury, are as follows:

It appears that for a number of years it was the practice of the Metropolitan Life Insurance Company to transfer certain of its assets, consisting of collateral loans and syndicate participations, on the 30th of December, either to John R. Hegeman, the defendant, who was the president of the insurance company, or to Vermilye & Co., a firm of bankers, and about the 2d day of January of the following year to secure the retransfer of these assets to the insurance company. The forgery indictments charge that some of the book entries made in accordance with these transactions were false entries and made by the defendant with the intent to defraud. On December 30, 1902, the insurance company was carrying on its books and actually owned: 296 shares Federal Trust Company stock; temporary loan to William A. Read, $200,000; sundry syndicate participations, $1,401,943.25; sundry other temporary loans to George P. Sheldon, James P. Moran, and others, aggregating $138,055. These loans were all secured by collateral. On December 30, 1902, the defendant gave to the company his check on the National Shoe & Leather Bank for $138,055 to take up the sundry temporary loans above referred to, which aggregated that amount. The receipt of this check was entered in the ledger, and the check was deposited and collected. On January 2, 1903, the loans were received back by the insurance company, the defendant returning the securities, and a check of the insurance company for the same amount, $138,055, being given to the defendant. This payment of January 2d was entered by the assistant cashier in Cash Book Q; the aggregate amount being distributed in the entries to the different temporary loans which it represented. The form of the entry was as follows:

| 1903 | | | 29440 | |
|---|---|---|---|---|
| Jany. 2 | 62 | Temp. Loan | Sheldon ................................ | 4,000 |
| | 62 | do | Moran .................................. | 15,000 |
| | 62 | do | U. S. Electric.......................... | 38,000 |
| | 62 | do | Crane .................................. | 51,500 |
| | 62 | do | Meighan ................................ | 3,280 |
| | 62 | do | Hiltner ................................ | 25,000 |
| | 62 | do | Hancock ................................ | 1,275 |

The above entries of January 2d are the basis of the charge contained in indictment No. 93 (forgery). That indictment charges that these entries purported to indicate that the Metropolitan Life Insurance Company on that date had paid to the persons named the sums set opposite their names as loans to the said persons; whereas in truth and in fact the insurance company did not on that date pay to the said persons any sums whatsoever.

On December 30, 1902, the insurance company delivered to Vermilye & Co. certificates for 296 shares of Federal Trust Company stock, and the collateral securing the $200,000 call loan of William A. Read, accompanied by the following letter signed by the defendant:

"Gentlemen: The bearer will hand you 296 shares of Federal Trust Company stock, with receipted bill for same amounting to $60,256. This is sold to you on the understanding that you are to resell it to us on January 2, 1903, we paying you the same price. Also inclosed find collateral for account of William A. Read, for which please send us check for $200,000. Whatever part of this or all you would like back on January 2, 1903, advise us of at your convenience. To-morrow we will send you certain papers as heretofore advised in detail and receive from you check for $1,401,943.25. We will send you

our check at the same time on deposit account for $600,000. On January 2, 1903, we will reverse this, sending you our check for $1,401,943.25, and drawing on deposit account for $600,000. Whatever interest may be involved in this please make us an account of after the transactions are over.

      "Yours very truly,               John R. Hegeman, President."

On the same day Vermilye & Co. delivered to the insurance company their check for $260,256. On the following day, December 31, 1902, the company also delivered to Vermilye & Co. the papers in connection with the company's interests or participations in four syndicates, namely, the National Shoe & Leather Bank syndicate, $27,000; Omaha & Sioux City syndicate, $800,000; Pittsburgh & Toledo syndicate, $150,000; and San Francisco Street Railway syndicate, $424,-943.25—aggregating $1,401,943.25. For these papers the company received the check of Vermilye & Co. for $1,401,943.25. On January 2, 1903, the insurance company delivered to Vermilye & Co. two checks, signed by the company and drawn to the order of Vermilye & Co., one for $1,401,943.25 and the other for $60,256. On the same day, in accordance with the request of the defendant accompanying the checks, Vermilye & Co. returned to the insurance company the syndicate participation papers and the Federal Trust Company stock certificates. When the transfer of the syndicate papers to Vermilye & Co. was made, on December 31, 1902, the assistant cashier of the insurance company entered in Cash Book Q the receipt of the amount paid by Vermilye & Co. distributed to the four syndicate participations which it represented. These entries were posted by the same assistant cashier in Ledger E in the following form:

Omaha & Sioux City Extension Synd. Co.:
1902
Dec. 31, Cash 84..............................................$800,000

Pittsburgh Toledo Syndicate:
1902
Dec. 31, Cash 84..............................................$150,000

The National Shoe & Leather Bank Syndicate:
1902
Dec. 31, Cash 84..............................................$27,000

San Francisco Street Railway Syndicate:
1902
Dec. 31, Cash 84..............................................$424,943.25

The four entries given above on December 31, 1902, are the basis, respectively, of indictments Nos. 96, 97, 98, and 99 (forgery).. These indictments charge that said entries purported to indicate that on the 31st day of December, 1902, the insurance company had sold the said investments for the sums stated and received the said sums of money therefor; whereas in truth and in fact the company had not sold said investments or received the said sums, or any sum, therefor.

On December 31, 1903, in a similar manner, sundry collateral loans aggregating $359,475 were transferred by the insurance company to the defendant; the defendant giving the insurance company his check for that amount, which check was deposited and collected. On January 2, 1904, the loans were retransferred by the defendant to the insurance company; the insurance company giving its check therefor. The payment by the insurance company to the defendant on January 2d was

entered by the assistant cashier in Cash Book R, distributed to the various temporary loans which it represented. The entries were in the same form as those of the previous year. These entries in Cash Book R under date of January 2, 1904, are the basis of the forgery charge contained in indictment No. 95.

On December 30, 1904, the insurance company was carrying sundry temporary loans amounting to $1,492,875. On that day these loans were transferred to Vermilye & Co.; the insurance company receiving their check for the aggregate amount. This check was deposited and collected by the insurance company. On January 3, 1905, the loans were retransferred to the insurance company; the insurance company giving Vermilye & Co. its check for the aggregate amount. This payment on January 3, 1905, was entered by the assistant cashier in Cash Book S, distributed to the different temporary loans which it represented. The entries were similar to the entries of the two previous years. These entries of January 3, 1905, are the basis of the forgery charge contained in indictment No. 94.

The perjury indictments (Nos. 100, 101 and 102) are based upon the inclusion in the annual reports for the years 1902, 1903, and 1904 of the Metropolitan Life Insurance Company to the State Superintendent of Insurance, verified by the defendant, of certain statements in effect asserting the validity of the end of the year transactions with Hegeman and Vermilye & Co.; on the omission of any reference to syndicate participations or loans made on collateral; and, furthermore, upon the statement in said reports that there were no sums, except a specified amount, not drawing interest, when in fact there were two additional deposits of $100,000 each on which no interest was being paid during said years.

The prosecution concedes the power of the court to entertain these motions; nor can its power to dismiss in a proper case be questioned, in view of the decisions in People v. Glen, 173 N. Y. 395, 66 N. E. 112, and People v. Sexton, 187 N. Y. 495, 80 N. E. 396.

Approaching in the first instance the consideration of the forgery indictments, there are many contentions raised on the defendant's behalf. It is claimed that he has not been sufficiently connected with the making of the entries in question to justify his being held responsible therefor. While it is true that there is some indefiniteness in the testimony of some of the witnesses as to who directed the making of the entries in question, yet it does appear that defendant had personal charge of all the year-end transactions and alone could furnish the information upon which the entries were made, and the witness Ecker testifies positively that the defendant directed the entries to be made in the books. I am of the opinion that there was sufficient evidence before the grand jury to justify the finding that the defendant was the official who had given the directions for the making of these entries.

As to the validity of the year-end transactions (and this term may be used throughout to designate those transfers and retransfers by which it was sought to pass title to both loans and syndicate transactions and reacquire the same) a question is raised which is not free from doubt. It appears from the testimony of both parties to these transactions—i. e., the officers of the company and Vermilye & Co.—

that they regarded it as an actual transfer of the loans and syndicate participations to Vermilye & Co. when made to them and to Hegeman when made to him, although confessedly there was an actual agreement to retransfer the loans and syndicate participations to the company after January 1st. But what, to some extent at least, negatives this claim of an actual bona fide sale and resale, is the fact that in the purchase of these loans Vermilye & Co. made no examination of the collateral and relied on the responsibility of the company, that Vermilye & Co. never received the interest accumulating on these loans during the few days they were in their possession, and that Vermilye & Co. charged and received interest on the amount they paid on their alleged purchase until they retransferred the same. But it is unnecessary, in view of the conclusions later expressed, to decide whether or not, upon the testimony before the grand jury, these transactions were valid sales. Of course, if they were, the indictments would fall, as in that event the entries would not be false.

But, even conceding these entries to be false or deceptive, in my opinion the indictments for forgery cannot be sustained by any evidence submitted to the grand jury. These indictments are found under section 515 of the Penal Code, which is as follows:

"A person who, with intent to defraud or to conceal any larceny or misappropriation by any person of any money or property, either (1) alters, erases, obliterates or destroys an account, book of accounts, record or writing, belonging to or appertaining to the business of a corporation, association, public office or officer, partnership or individual; or (2) makes a false entry in any such account or book of accounts; or (3) willfully omits to make true entry of any material particular in any such account or book of accounts made, written or kept by him under his direction, is guilty of forgery in the third degree."

These indictments fall within the provisions of subdivision 2 hereof. It thus appears that the two essentials to constitute a crime under this section are (a) the making of a false entry under the direction of defendant and (b) the intent in so doing to defraud. Conceding, for the purposes of this determination, the falsity of these entries, where is there any evidence in the mass of testimony taken before the grand jury of any intent to defraud? Where is the evidence from which an intent to defraud can be inferred, even remotely? Who was to be defrauded? Who was to profit by the defrauding? Of what could any one be defrauded? The learned and exhaustive brief of the district attorney contains no answer to these questions, nor is an answer to be found anywhere in the records submitted herewith. I have read carefully every line of testimony submitted to the grand jury, and there is nowhere a suggestion of a criminal intent in anything that was done. A motive is plainly apparent, and in fact it appears by the testimony of several witnesses, and that was to show by the annual reports that the Metropolitan Life Insurance Company was not a loaning company, or, as one of the witnesses put it, the officers did not desire to have it known that they were loaning on collateral, as otherwise they would be overwhelmed with applications for loans on collateral, and they would have to install a special service if they made such loans generally, while their policy was, as they phrased it, "to keep away from everything in connection with the stock ticker." But a motive in

a criminal case differs widely from an intent. Here the motive certainly was not criminal. However, no matter whether the motive be good or bad, if the presence of the intent required to constitute a particular unlawful act is either proved or implied, the offense, if committed, is complete. But was the intent an unlawful one? The intent, obviously, was to exclude from the annual reports all references both to syndicate operations and collateral loans, that it might not appear that the company was investing any money whatever therein, and to accomplish this by having a sale and resale of these securities; the sale taking place before December 31st, and the resale after January 1st. But wherein does this constitute an attempt to defraud?

. There is, perhaps, no legal term which has given rise to more varying definitions than "defraud." Some of these definitions may show how wide a range they have taken:

"To defraud is to withhold from another that which is justly due him, or to deprive him of a right by deception or artifice." Burdick v. Post, 12 Barb. 168.

"The term 'defraud' means to deprive of a right, either by obtaining something by deception or artifice, or by taking something wrongfully, without the knowledge or consent of the owner." People v. Wiman, 85 Hun, 320, 32 N. Y. Supp. 1037.

"The task, often pronounced to be impossible, of exhaustively defining fraud, will not be here attempted. It is enough to say that fraud in a general sense is the deceitful, unlawful appropriation of the property of another, and a fraudulent intent is the intent to effect such appropriation." Wharton on Criminal Law, § 124.

"To deprive of something dishonestly is to defraud." Horman v. United States, 116 Fed. 350, 53 C. C. A. 570.

"To defraud is to cheat, to deprive another of a right, to withhold wrongfully what is due to him, or to prevent him wrongfully from obtaining what he may justly claim. To defraud implies or includes all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence generally reposed, and are injurious to another, or by which an undue and unconscionable advantage is taken of another." 9 Am. & Eng. Ency. Law (2d Ed.) p. 180.

"To defraud is to deprive of some right, interest, or property by deceitful devices; to withhold from wrongfully; to injure by embezzlement; to cheat; to overreach; to withhold from another that which is justly due to him, or to deprive him of a right by deception or artifice; to deprive of a right by withholding from another by indirection or device that which he has a right to claim or obtain; to deprive of something dishonestly." 13 Cyc. p. 766.

An examination of the cases upon which these definitions are based demonstrates that the term "defraud" implies in every case the obtaining of an unconscionable advantage to one party or the unjust deprivation of property or rights belonging to the other. It is, of course, not essential to the existence of an intent to defraud that the design should be to deprive some one of personal or real property. It may as well exist in the design to deprive some one of a right. Nor is it necessary to have in mind the defrauding of a particular person, if the consequences of the act would necessarily or might possibly be to defraud any person. But there must be at all events a possibility of some person being defrauded of something. The crime involves moral turpitude. Section 718 of the Penal Code renders it unnecessary to aver or prove an intent to defraud any particular person; but by section 721, Pen. Code, it suffices if the intent appears to defraud any person, association, or body politic or corporation whatsoever. This is

in accord with an early rule enunciated by Lord Chief Justice Tindale, 5 Car & P. 266, cited with approval by the United States Circuit Court of Appeals in Horman v. United States, 116 Fed. 352, 53 C. C. A. 572, as follows:

"Where a statute directs that in order to complete an offense it must have been with intent to injure or defraud any person, there is no occasion that any malice or ill-will should subsist against the person whose property is so destroyed. It is a malicious act in contemplation of law when a man willfully does that which is illegal and which in its necessary consequence must injure his neighbor."

No such intent appears here as brings the case within the scope of section 721. The mere making of a false entry in corporate books is not under the present state of our law a crime. Such an entry might be made in various ways and for various purposes. It might be made (a) through mistake; (b) to accomplish by appropriate fictitious entries a proper bookkeeping result; (c) to conceal the evidence of a crime already committed or to render its detection impossible or more difficult; (d) to facilitate the commission of a future crime; (e) to defraud creditors, present or prospective, stockholders or any other person; (f) to deceive some one with no purpose of gain, profit, or advantage, either contemplated or possible of accomplishment.

Under the reasoning of the decision in Phelps v. People, 72 N. Y. 371, and similar cases, subdivisions "a," "b," and "f," would not be criminal. Subdivision "c" would come under the phraseology "to conceal any larceny or misappropriation by any person of any money or property." Subdivisions "d" and "e" would come within the phrase "with intent to defraud." The mere intent to deceive is not criminal; otherwise, any false entry knowingly made in the books of account of a corporation, no matter how trivial, immaterial, irrelevant, and harmless, would be a crime. That the Penal Code recognizes the distinction between an "intent to defraud" and an "intent to deceive" clearly appears from an examination of sections 591 and 592 thereof. In the case at bar it does not even appear that any one has been deceived. There is some suggestion that the state department of insurance may have been deceived; but there is no such proof in the case. On the contrary, these year-end transactions had been going on in the same way for many years. The entries showing the transfers in December and the retransfers in January appeared annually, with no concealment whatever. The securities deposited as collateral for the loans and the syndicate participation certificates or bonds were in the possession of the company continuously, except during the few days Hegeman or Vermilye & Co. held them under the transfers. The checks received and delivered were entered in the check and bank books. There is no proof that the loans were not amply secured by collateral, nor that the interest was not sufficient, nor that in any way the transaction was unlawful. The loans, as a matter of fact, have been shown by the testimony to have all been paid in full, nor is there any claim that the syndicate participations were unlawful, productive of loss, or even suspicious. There is no contention that the Metropolitan Life Insurance Company had not the right to lawfully loan money on collateral or to invest in these syndicate operations. The company has, upon the

proof, lost nothing by any of these operations, nor could it have lost anything.

The element of intent to defraud being ·essential to the crime of forgery in the third degree, it must affirmatively appear that sufficient evidence to establish the intent or to justify the inference of its existence has been received by the grand jury. "Where an act becomes criminal only through the existence of a specific intent, such intent must be proven, or the offense is not proven." State v. King, 86 N. C. 603. "It is a general principle of evidence that a man shall be taken to intend that which he does, or which is the immediate and natural consequence of his. act. But, where an act in itself indifferent becomes criminal if it be done with a particular intent, then the intent must be alleged and proved." Miller v. The People, 5 Barb. 204. "It is the criminal mind and purpose going with the act which distinguishes the criminal trespass from a mere civil injury." People ex rel. Perkins v. Moss, 187 N. Y. 420, 80 N. E. 386. "It is elementary, when a specific intent is required to make an act an offense, that the doing of the ' act does not raise a presumption that it was done with the specific intent." Lawson·on Presumptive Evidence, 472, cited with approval by the Court of Appeals in People v. Plauth, 100 N. Y. 592, 3 N. E. 790, 53 Am. Rep. 236. The facts being undisputed, the question whether the evidence shows the commission of a crime as charged is a question of law, and in that is involved necessarily the question whether one of the essential elements of the crime of forgery in the third degree, the intent to defraud, has been established, necessarily or by implication.

Having reached the conclusion that, not only has no intent to defraud been proven by the testimony taken before the grand jury, but that from such testimony no intent to defraud can be inferred, the motion to quash the indictments for forgery is granted.

With respect to the indictments for perjury a different situation exists. I believe that the question of whether or not the year-end transactions constituted actual sales is a question which cannot be necessarily determined as a matter of law upon the present state of the evidence, and I have expressly withheld its determination in disposing of the other motions. In any event, I am unable to say that as a matter of law, upon the proof before the grand jury, these transactions constituted actual sales. In the present state of the proof the statements in the annual reports as to the amount of noninterest-bearing funds of the Metropolitan Life Insurance Company were not correct. Whether these statements were actually false, whether they were material, and, if so, whether they were knowingly and corruptly made, are questions which cannot be disposed of upon this motion, but must await a trial of the indictments for perjury; for there are facts both claimed and conceded which were brought to the attention of the grand jury which are relevant to the charges of perjury and not to those of forgery, and which upon the present state of the proof do not justify the dismissal of the former.